In the Matter of the Application of the CITY of NEW YORK, Respondent, Relative to Acquiring Title to Wharfage. Rights Appurtenant to Pier Old Numbers Eight, Nine, Ten and Eleven, North River.

PAUL G. THEBAUD et al., Appellants.

New York (city of) — docks and piers — water fronts and title thereto — adverse possession — legislative policy since 1871 that the city of New York should be the exclusive owner of its water fronts — when private possession of water front under cover of title cannot ripen into title by adverse possession.

1. Where no express grant can be allowed the law will not resort to the fiction of an implied grant so as to create a prescriptive right.

2. Appellants claim title to certain property in the city of New York adjoining piers owned by them, resting their titles to these properties solely upon the presumption of a grant arising from an alleged adverse user in connection with the piers mentioned. Upon hearings before commissioners of estimate and apportionment appointed to determine the value of their property they were awarded substantial sums for the parcels under consideration. The charter of Greater New York provides (L. 1897, ch. 378, as amd. L. 1901, ch. 466, § 71) that " The rights of the city in and to its water front, ferries, wharf property, land under water, public landings, wharves, docks, streets, avenues, parks, and all other public places are hereby declared to be inalienable." Claimants assert that this provision of the charter has no application because their prescriptive rights to each of said parcels commenced to run prior to its enactment and rely solely on adverse possession, which did not commence before 1880, and presumption of a grant. Chapter 574 of the Laws of 1871 and chapter 335 of the Laws of 1873, as included in the Consolidation Act (L. 1882, ch. 410) and in the present charter (L. 1901, ch. 466), have been held by the courts to recognize and affirm the purpose of the legislature to make the property of the city constituting its water fronts inalienable. The decisions sustaining the power of the city of New York to sell its wharves and piers were based, so far as affected by the question of adverse possession, upon possession with claim of title commenced prior to 1873. Held, that upon the record and the statutes there is no presumption of such a grant in 1880 or at any other time.

3. Claim of appellants is also made to two other parcels upon the ground of alleged long possession under claim of title, it having inclosed the bulkheads in a system of sheds and piers and leased the same in connection with the leasing of such sheds and piers. *Held*, that, for the reasons stated in connection with the other parcels, and because the appellants' claim of adverse possession is in hostility to certain covenants contained in the deeds under and in pursuance of which they maintain in part their claims in this proceeding, the appellants have not, either as a matter of fact or law, established a presumption of a grant to them by the municipality of said parcels.

*Matter of City of New York* (*Piers Old Nos. 8, 9, 10 & 11*), 188 App. Div. 960, affirmed.

(Argued January 7, 1920; decided February 24, 1920.)

APPEAL, by permission, from an order of the Appellate Division of the Supreme Court in the first judicial department, entered June 20, 1919, which affirmed an order of Special Term denying a motion by the appellants herein for confirmation of the final report of commissioners of estimate in the above-entitled proceeding and directing said commissioners to review and correct their said report as to certain damage parcels therein set forth.

The facts, so far as material, are stated in the opinion.

*Cornelius W. Wickersham* and *George W. Wickersham* for appellants. The city of New York had the power at any time after the year 1882 to grant to claimants or their predecessors the right to build and maintain the piers designated herein as parcels " F-1 " and " G-1," and such a grant will be presumed from their open and adverse user for the prescriptive period. (*People* v. *N. Y. & S. I. F. Co.*, 68 N. Y. 71; *Mayor, etc.*, v. *Cons. Gas. Co.*, 18 N. Y. Supp. 536; 135 N. Y. 253; *Grimmer* v. *Tenement House Dept.*, 205 N. Y. 549.) Prior to 1897 incorporeal rights appurtenant to wharves and piers were alienable by the city of New York. (*Mayor, etc.*, v. *Hart*, 95 N. Y. 443; *Matter of City of New York*, 217 N. Y. 1; *Huthe* v.

*Clarke,* L. R. 25 Q. B. D. 391; *Matter of Hertle,* 120 App. Div. 717; 199 N. Y. 531; *Bank* v. *Kearny,* 44 App. Div. 592; *State* v. *Gordon,* 60 Mo. 383; *Davol* v. *Quinby,* 11 Allen, 208; *Cushman* v. *Glover,* 11 Ill. 600; *Gilbert* v. *Holmes,* 64 Ill. 548; *Knickerbocker Ice Co.* v. *42d St. & G. St. Ferry R. R. Co.,* 85 App. Div. 530; 176 N. Y. 408; 177 N. Y. 528; *Kings County Fire Ins. Co.* v. *Stevens,* 101 N. Y. 411.) Claimants' open adverse user of parcels " F-1 " and " G-1 " under claim of right for more than twenty years was clearly established by undisputed evidence, and a grant from the city will be presumed from the facts shown. (*Bell* v. *City of New York,* 77 App. Div. 437; *Matter of City of New York* [*Willard Parker Hospital*], 217 N. Y. 1.) The Special Term erred in holding that the so-called " reservations " in early deeds estopped claimants from setting up title by prescription as to the strips of bulk-head " B-1 " and " D-1." (*Craig* v. *Wells,* 11 N. Y. 315; *Sherman* v. *Kane,* 86 N. Y. 57; *Kent* v. *Harcourt,* 33 Barb. 491; *McKinney* v. *Lanning,* 139 Ind. 171.) The appellants' title to parcels " B-1 " and " D-1 " by prescription was clearly established. (*Mayor, etc.,* v. *Law,* 6 N. Y. Supp. 628; 125 N. Y. 380; *Langdon* v. *Mayor, etc.,* 93 N. Y. 129; *Williams* v. *Mayor, etc.,* 105 N. Y. 419; *Timpson* v. *Mayor, etc.,* 5 App. Div. 424.)

*William P. Burr,* Corporation Counsel (*Charles J. Nehrbas* and *Charles D. Olendorf* of counsel), for respondent. Parcels F-1 and G-1 were constructed in violation of express legislative enactment; no claim of title by prescription can be advanced as to such parcels, for no grant can, under such circumstances, be presumed. (*People* v. *N. Y. & S. I. Ferry Co.,* 68 N. Y. 71; *Matter of Mayor, etc.,* 18 N. Y. Supp. 536; *People* v. *Vanderbilt,* 26 N. Y. 287; 28 N. Y. 396; *Ogdensburg* v. *Lovejoy,* 2 T. & C. 83; *People* v. *Horton,* 5 Hun, 516; 64 N. Y. 610; *Delaney* v. *Blizzard,* 7 Hun, 7; *Lewis* v. *N. Y. & H. R. R. Co.,* 162 N. Y. 202.) The claimants are estopped from

claiming title by adverse possession or prescription to the wharfage rights, etc., appurtenant to the two strips of bulkhead designated on the commission's damage map as parcels B-1 and D-1. (*Kinyon* v. *Kinyon*, 6 Misc. Rep. 584; *Mayor, etc.,* v. *Law*, 6 N. Y. Supp. 628; 125 N. Y. 380; *Burns Bros.* v. *City of New York*, 178 App. Div. 615.) Mere open and notorious possession for a period of twenty years is not sufficient to establish a claim of adverse possession or prescription. (*Heller* v. *Cohen*, 154 N. Y. 299; *Kneller* v. *Lang*, 137 N. Y. 589; *Casey* v. *Dunn*, 25 J. & S. 381; *Matter of Department of Public Parks*, 53 Hun, 556; *Driggs* v. *Phillips*, 103 N. Y. 77; *St. Vincent, etc., Orphan Asylum* v. *City of Troy*, 76 N. Y. 108.)

CHASE, J. The commissioner of docks, with the approval of the commissioners of the sinking fund, and acting for and on behalf of the city of New York, commenced a proceeding in 1914 to acquire Piers Old Nos. 8, 9, 10 and 11, North river, at or near the foot of Rector and Carlisle streets with appurtenant bulkheads.

The claimants at the time were the owners of said piers and also in possession of a strip of pier extending along the north side of Pier Old No. 11, which was 310.5 feet long by 12 feet wide. The said strip of pier was built upon piles, heavily floored and covered with a roof, and was used in connection with Pier Old No. 11 as a driveway for the trucks employed in loading and unloading vessels moored to the pier.

They were also in possession of a another strip of pier on the north side of Pier Old No. 10 which was 194.71 feet long and 20.7 feet wide.

Claimants also assert title to a portion of the bulkhead between Pier Old No. 11 and Pier Old No. 10, opposite the westerly end of Carlisle street and immediately adjoining Pier Old No. 11 on the south.

In the brief of the appellants it is described as follows:

" It is merely a ' string piece ' or bulkhead not a portion of the bed of the street and is 8.8 feet long. The right to maintain it and to collect wharfage and cranage therefrom is a purely incorporeal right involving no title to the fee of any land."

Claimants also assert title to a portion of the bulkhead between Pier Old No. 9 and Pier Old No. 8, opposite the westerly end of Rector street adjoining Pier Old No. 8 on the north, which is 9.48 feet long. The said strips of pier and pieces of bulkhead are known in the proceeding and on the maps respectively as parcels F-1, G-1, B-1 and D-1.

The city of New York, in its proceeding to acquire title to the old piers, did not include the pieces known as parcels F-1, G-1, B-1 and D-1, because it asserted then and has ever since maintained that the claimants have no title to them but that the city is the absolute and unqualified owner of such rights as exist and are designated as stated.

Parcel B-1 is included within the bounds of Carlisle street and parcel D-1 is included within the bounds of Rector street. The claimants admit that they have no record title to either of the four parcels thus described. They rest their title solely upon the presumption of a grant arising from an alleged adverse user of said property in connection with the old piers mentioned. It is not asserted nor claimed that the appellants ever paid rent to the city for said rights or pieces of property or that they have ever had a lease therefor, or a license to maintain the same. They claim to have held and retained them as a matter of right.

The commissioners of estimate and assessment made awards to the several owners for the several piers described in the proceeding and then made awards for " damages to the wharfage rights, terms, easements, emoluments and privileges appurtenant " to said piers.

The awards for the parcels under consideration were:

| | |
|---|---|
| B-1 | $1,616 |
| D-1 | 1,896 |
| F-1 | 19,230 |
| G-1 | 31,210 |
| | $53,952 |

The proceeding so far as it relates to the old piers has been closed and the damages awarded have been paid. The city objected to the awards for parcels B-1, D-1, F-1 and G-1. The Special Term denied the motion to confirm the report of the commissioners so far as it related to them. An appeal was taken therefrom to the Appellate Division, where the order denying the motion to confirm the report so far as it related to parcels B-1, D-1, F-1 and G-1 was unanimously affirmed. (*Matter of City of New York*, 188 App. Div. 960.)

An appeal has been taken to this court by virtue of an order granting permission therefor.

Where no express grant can be allowed the law will not resort to the fiction of an implied grant so as to create a prescriptive right. (*Scallon* v. *Manhattan Railway Co.*, 185 N. Y. 359.)

The charter of Greater New York provides (Laws of 1897, chap. 378, as amended, L. 1901, ch. 466) that " The rights of the city in and to its water front, ferries, wharf property, land under water, public landings, . wharves, docks, streets, avenues, parks, and all other public places *are hereby declared to be inalienable.*" (Sec. 71.)

The claimants assert that the provision of the charter quoted has no application to them because their prescriptive right as to each of said parcels commenced to run prior to its enactment. (*Scallon* v. *Manhattan Railway Co., supra.*)

It may be assumed that at least prior to 1853 (Chap. 217

of the Laws of 1853) all public property in the city of New York could be sold in the manner provided by statute in the name of the mayor, aldermen and commonalty of the city of New York. (*Mayor, etc., of N. Y.* v. *Hart*, 95 N. Y. 443.) Although by the act of 1853 a special limitation was placed upon the period for which a lease could be given for ferries, docks, piers and slips, there had not, prior to the reorganization of the city government in 1870 and 1871, been any definite policy shown by the statutes against private ownership in and improvement of the city water front or parts thereof. However, by chapter 137 of the Laws of 1870 a department of docks with powers to be established and defined by the commissioners of the sinking fund, was provided for (Sec. 99), and in 1871 (Chap. 574 of the Laws of 1871) the section of the charter providing for a department of docks was greatly elaborated, and by it a change of policy in regard to the control and ownership of the city water front was established, and it became the purpose of the city as defined by the act to retain its ownership of all wharves, piers, bulkheads and structures thereon, and waters adjacent thereto, and all slips, basins and structures thereon and the appurtenances, easements, uses, reversions and rights then owned by it, and to acquire and hold all other wharves, piers, bulkheads and structures thereon and waters adjacent thereto, and all slips, basins and structures thereon and the appurtenances, easements, uses, reversions and rights together constituting the entire water front of the city.

Subdivision 2 of section 6 of the act of 1871, which amended section 99 of the act of 1870, provides:

" 2. The department of docks in the city of New York shall have exclusive charge and control, subject in the particulars hereinafter mentioned to the commissioners of the sinking fund of said city, of all the wharf property belonging to the corporation of the city of New York, including all the wharves, piers, bulkheads and structures

thereon, and waters adjacent thereto, and all the slips, basins, docks, water-fronts, land under water, and structures thereon, and the appurtenances, easements, uses, reversions and rights belonging thereto, which are now owned or possessed by the said corporation, or to which said corporation is or may become entitled, or which said corporation may acquire under the provisions hereof, or otherwise; and said department shall have exclusive charge and control of the repairing, building, rebuilding, maintaining, altering, strengthening, leasing, and protecting said property and every part therof, and of all the cleaning, dredging and deepening necessary in and about the same. Said department is also hereby invested with the exclusive government and regulation of all wharves, piers, bulkheads and structures thereon, and waters adjacent thereto, and all the basins, slips and docks, with the land under water in said city not owned by said corporation. The duties and powers heretofore performed and exercised by any officer, department or bureau of the said corporation in and about all or any part of the said property are hereby transferred to and vested exclusively in the said department; but this provision shall not affect the aforesaid powers of the commissioners of the sinking fund.''

Subdivision 3 provides that the board of the said department of docks shall determine upon the plan of water front to be submitted to the commissioners of the sinking fund and if adopted the plan or plans so adopted shall be filed and thereafter all wharves, piers, bulkheads, basins, docks or slips or any wharf, structure or super-structure shall be built in accordance therewith.

Subdivision 4 provides as follows: '' The said board of the department of docks is hereby authorized to acquire, in the name and for the benefit of the corporation of the city of New York, any and all wharf property in said city to which the corporation of the city of New York then has no right or title, and any rights, terms, easements,

and privileges pertaining to any wharf property in said city and not owned by said corporation; and said board may acquire the same either by purchase or by process of law, as herein provided. Said board may agree with the owners of any such property, rights, terms, easements or privileges, upon a price for the same, and shall certify such agreement to the commissioners of the sinking fund, and if said commissioners approve of such agreement, said board shall take from such owners, at such price, the necessary conveyances and covenants for vesting said property, rights, terms, easements, or privileges in, and assuring the same to, the mayor, aldermen, and commonalty of the city of New York forever, and said owners shall be paid such price from the city treasury, as hereinafter provided. If the said board shall deem it proper that the said corporation should acquire possession of any such wharf property, rights, terms, easements, or privileges for which no price can be agreed upon between the owners thereof and the said board, the said board may direct the counsel to the corporation of said city to take legal proceedings to acquire the same for the mayor, aldermen and commonalty of said city, and the said counsel to the corporation shall take the same proceedings to acquire the same as are by law provided for the taking of private property in said city for public streets or places   *   *   * and said board is also empowered to acquire in like manner the title to such lands under water and uplands as shall seem to said board necessary to be taken for the improvement of the water-front."

Subdivision 5 provides for the establishment and construction of wharves, piers, bulkheads, basins, docks or slips in the territory embraced in the plan or plans.

Subdivision 6 provides that the board of the department of docks shall regulate the charges for wharfage and dockage of all vessels admitted thereto, and it further provides that said board " may in the name and for the benefit of the corporation of said city lease any or all

of such property, for a term not exceeding ten years, and covenant for renewal or renewals, at advanced rents, of such leases for terms of ten years each, but not exceeding in the aggregate fifty years."

Subdivision 7 provides for enforcing the rules of the department and the government and care of the property.

Subdivision 9 provides for a report to the mayor, and subdivision 10 that the commissioners of the land office are authorized to convey to the city the land under water used by it in the construction of wharves, piers, etc., under the act, whenever required by the board of dock commissioners.

Subdivision 12 provides: " The terms ' property ' and ' wharf property,' whenever used therein, shall be taken to mean not only all wharves, piers, docks, bulkheads, slips, and basins, but the land beneath the same, and all rights, privileges, and easements thereto."

In 1873 (Laws of 1873, chap. 335) the local government of the city of New York was again reorganized. By section 102 thereof it is provided: "·There shall continue to be, as now provided and recognized by special laws and ordinances, a board of commissioners of the sinking fund, composed of the mayor, recorder, chamberlain, comptroller and the chairman of the finance committee of the board of aldermen, with all the powers and duties now assigned, designated and ratified by existing laws and ordinances. The said board shall have power to sell or lease, for the highest marketable price or rental, at public auction or by sealed bids, and always after public advertisement and appraisal under the direction of said board, any city property, *except wharves and piers*."

The act of 1873 repeals substantially all prior acts relating to the city of New York, but among the other parts of acts saved from the repeal is section 6 of the act of 1871, from which we have quoted at length, and which gives the department of docks subject to the authority of the commissioners of the sinking fund of the city the

exclusive powers mentioned, including all powers theretofore exercised by any officer, department or bureau of the corporation.

The provisions of the acts of 1871 and 1873 specially referred to or quoted were in substance included in the Consolidation Act of 1882 (Laws of 1882, chap. 410) and in the present charter of Greater New York. The courts at different times have recognized and affirmed that the purpose of the legislatures of 1871 and since has been to make the property of the city constituting its ·water front inalienable.

In *Kingsland* v. *Mayor, etc., of N. Y.* (110 N. Y. 569) the court, referring to chapter 574 of the Laws of 1871, say: " The city charter of the previous year was amended so as to change the whole dock system of the harbor. The law provided for a plan which should girdle the city with new wharfs and piers, belonging wholly to the municipality, *and ending all private ownerships along the water front.* The wharves of private owners were to be purchased by agreement, or taken in the ordinary manner by proceedings under the right of eminent domain." (Page 578.)

" The city acted under the Law of 1871 by adopting the plan which involved the termination of all private ownership of docks and wharves and the construction of a new outer line." (Page 581.)

In *Williams* v. *Mayor, etc., of N. Y.* (105 N. Y. 419) the court, referring to the acts of 1870 and 1871 and the department of docks, say: " The act organizing that department will and *was intended to change* utterly the water front system of the city. Upon the new line, the municipality is to build all docks and wharves and piers, and *own them all, and the old plan of wharves and piers owned by individuals is to be swept away.*" (Page 437.)

In *Langdon* v. *Mayor, etc., of .N. Y.* (133 N. Y. 628), again referring to said acts, the court say: " The system of private ownership of wharfage rights was, however, cumbersome, and its working evidently unsatisfactory.

The material prosperity of the city was so dependent upon its commerce that nothing short of the *exclusive ownership and control by the body politic of all the docks and other like facilities required for the encouragement of ocean and river traffic would be sufficient to meet the wants of the public in this respect.* The legislature recognized this necessity and by the enactment of chapter 574 of the Laws of 1871, inaugurated a radical and sweeping change of policy upon the subject. *Private ownership of wharves and wharfage rights were from that time subjected to a process of extinction."* (Page 635.)

In *Matter of Mayor, etc., of New York* (135 N. Y. 253) the court say: " In 1871 the legislature changed entirely the general system by which this duty of building bulkheads, docks and piers had theretofore been performed. Instead of devolving upon private owners the duty of building such structures and giving to private individuals the right to collect wharfage, a general and vast system was provided for by the act of 1871 * * *. The adoption of the plan spoken of *contemplated the purchase or erection and the possession and ownership by the city of a great number of piers to the exclusion of all private ownership."* (Page 262.) (See *Burns* v. *City of New York*, 158 App. Div. 729; reversed, for a reason not affecting the question now considered, 213 N. Y. 516; *Langdon* v. *Mayor, etc., of N. Y.*, 93 N. Y. 129.)

The intention of the legislature to prohibit the alienation of all water front property owned by the city would seem to be included in its purpose to authorize and empower the city to obtain and continue to hold complete control of its water front as provided by the statutes. A power of sale in the board of aldermen is not only not essential to the accomplishment of the purpose of the legislature and the work of the board of the department of docks but would be antagonistic to and possibly destructive of its work and purpose as defined by the statutes.

When there is a fair, reasonable and substantial doubt concerning the existence of an alleged power in a municipality, the power should be denied. (1 Dillon on Mun. Corp. [5th ed.] § 237, p. 448.)

The decisions referred to by the appellants as sustaining the power of the city of New York to sell its wharves and piers, viz., *Matter of City of New York* (217 N. Y. 1); *American Ice Company* v. *City of New York* (217 N. Y. 402) and *Bell* v. *City of New York* (77 App. Div. 437) were based, so far as affected by the question of adverse possession, upon possession with claim of title commenced prior to 1873.

It is not claimed by the appellants that their alleged adverse possession of the two " widened parts " of the old piers commenced prior to 1880. If in 1880 and thereafter until 1897 the city of New York could not have sold to the claimants the right to erect and maintain the strips of pier now known as parcels F-1 and G-1, the Special Term and Appellate Division were right in refusing to sustain awards to the claimants therefor.

Without discussing the other reasons asserted by the respondent why a presumption of a grant of said parcels or rights therein to the appellants from the municipality could not be sustained, we are of the opinion that upon the record and the statutes as stated above there is no presumption of such a grant in 1880 or at any other time.

The order so far as it relates to parcels F-1 and G-1 should be affirmed.

The title, if any, of the appellants to parcels B-1 and D-1 is based upon alleged long possession thereof, with claim of title thereto. The respondent denies that the appellants have ever been in adverse possession of said parcels, and it also asserts that they are estopped from claiming possession thereof adverse to it because of covenants contained in deeds of lands and rights given to their predecessors in title as in such deeds expressly

provided and under which deeds title to such lands and rights is claimed by them.

In 1838 West street opposite Rector and Carlisle streets as laid out on the maps of the city was under water in the Hudson river. On the 14th day of September, 1838, two deeds were given by the mayor, aldermen and commonalty of the city of New York to predecessors in title of the appellants to lands on the east side of West street. The deeds were received in evidence as a part of the appellants' case. One of these deeds was given to Peter Schermerhorn and others, executors, etc., by which the city of New York conveyed two certain water lots " vacant ground and soil under water, made land, and gained out of the North or Hudsons River." One lot is described as at the northeasterly corner of Rector and West streets; being seventy-six feet on West street and eighteen feet eight inches on Rector street. The other lot is described as at the southeasterly corner of Rector and West streets, being thirty-one feet on West street and nineteen feet ten inches on Rector street. The lots were further described as extensions into the river of land previously granted to other persons named.

The second deed similar in form was given to Duncan P. Campbell and others, executors, etc. It describes another certain water ·lot at the southeasterly corner of West and Carlisle streets two hundred and thirty-three feet on West street and ten feet nine inches on Carlisle street. It also is further described as an extension into the river of premises previously granted to another person named. In the Schermerhorn deed the grantees covenanted " For themselves, their heirs, executors, administrators and assigns * * * and to and with the said parties of the first part their successors and assigns * * * within three months next after they shall be thereunto required by the said parties of the first part or their successors * * * at their own proper costs and charges, build, erect and make and

finish or cause to be built, erected, made and finished according to the directions of the said parties of the first part or their successors, a good and sufficient firm wharf, bulkhead or street seventy feet in width in front of and over and across the premises hereby granted from the northerly to the southerly side thereof being a part of West street and also one other good and sufficient firm wharf or street forty-three feet in width between the two above described lots hereby granted and continued to the said river being the continuation of Rector street as the said streets are laid out and designated on the said map."

The grantees also covenanted that they and their executors, administrators or assigns or some of them shall and will " from time to time and at all times hereafter at their own proper costs, charges and expenses uphold and keep in good order and repair the whole of those parts of the said streets and bulkheads which the said parties of the second part have covenanted to build * * * and also that the same shall forever thereafter continue to be and remain public streets and highways for the free and common use of the inhabitants of the said city * * *."

By the deed it was covenanted that the parties of the second part should " enjoy, take, receive and hold to their own proper use * * * all manner of wharfage, cranage, advantages and emoluments growing or accruing by or from that part of the westerly side of West street lying in front of the premises hereby granted and fronting on the said Hudson River."

It is therein further covenanted and agreed " *that all manner of wharfage, cranage, advantages, and emoluments to grow or accrue along the westerly end of Rector street shall be and the same is hereby reserved for the parties of the first part* (*the city*) *their successors and assigns* and may be received and collected by them for their own use and benefit."

Covenants similar in form and substance were contained in the deed to Campbell and others, except, of course, such covenants related to that part of West street opposite the property in that deed described and to the continuation of Carlisle street instead of the continuation of Rector street.

The streets and wharves were built accordingly and it is with reference to the face of the wharves on the westerly side of West street at the continuation of Rector and Carlisle streets respectively that the claim is now made.

The respondent claims that any work done or possession had and continued by the grantees in the deeds mentioned and their successors in title, was done and continued pursuant to the covenants contained in said deeds.

The claim of the appellants, as we understand it, is, that because of their having inclosed the bulkheads in a system of sheds and piers and leased the same in connection with the leasing of such sheds and piers, it should have been found that they have held the parcels of bulkhead under consideration in such open hostility and antagonism to the city as to inaugurate and continue an adverse possession on which to found a title thereto.

The Special Term held in substance that the parcels were always within the public streets of the city and that any possession of the incorporeal rights constituting the claim of appellants and their predecessors in title has always been in pursuance of the covenants contained in the deeds from the city.

The same questions relating to the possibility in any case of sustaining a presumption of a grant to the appellants arises in respect to parcels B-1 and D-1 as in the case of parcels F-1 and G-1. For the reasons stated and because the appellants' claim of adverse possession is in hostility to the covenants contained in the deeds under and in pursuance of which they maintain in part their claims in this proceeding, we think that even

admitting and considering the resolutions of the board of the department of docks which were excluded by the commissioners the appellants have not either as a matter of fact or law established a presumption of a grant to them by the municipality of said parcels B-1 and D-1.

The order so far as it relates to parcels B-1 and D-1 should be affirmed.

The order should be affirmed, with costs.

HISCOCK, Ch. J., COLLIN, CARDOZO, POUND, CRANE and ANDREWS, JJ., concur.

Order affirmed.