**BROOKLYN WATERFRONT TERMINAL CORP., Plaintiff,**

v.

**INTERNATIONAL TERMINAL OPERATING CO., Inc. and Fireman's Fund Insurance Company, Defendants.**

United States District Court
S. D. New York.
March 20, 1962.

Edward R. Downing, New York City, Thomas O. Markey, New York City, of counsel, for plaintiff.

Bigham, Englar, Jones & Houston, New York City, John L. Quinlan, Robert J. De Boissiere, New York City, of counsel, for defendants.

WEINFELD, District Judge.

Plaintiff, Brooklyn Waterfront Terminal Corp., hereafter called Brooklyn, seeks to recover damages to a pier allegedly caused by dredging operations conducted by or on behalf of the defendant, International Terminal Operating Co., Inc., hereafter called International. Defendant denies liability, asserting in general that the damage to the pier was due to defective conditions existing prior to the dredging.

Brooklyn, the owner of Pier 3, located at the foot of East 19th Street, Gowanus Canal, Brooklyn, New York, leased it to International in April 1956 for a fifteen-year term. In order to accommodate ships of deep draft, International, in November 1956 and January 1957, pursuant to permission granted it by plaintiff, dredged the slip of the pier to a depth of twenty-eight feet below mean low water at a distance of twenty-five feet off the face of the pier. This dredging, however, failed of its intended purpose; vessels went aground in the slip and could not be berthed close to the pier. Thereupon International requested Brooklyn's consent to another dredging —this time to a depth of thirty feet below mean low water and at a distance of ten feet off the face of the pier.

Brooklyn questioned whether a dredging to a greater depth and closer to the fender piles could be effected without damage to the pier. However, consent thereto was granted, conditioned upon International's agreement to make good any damage that might result to the pier and bulkhead and also upon the issuance of an appropriate policy of insurance in plaintiff's favor, which in due course was issued by the co-defendant, Fireman's Fund Insurance Company. Thereafter, the second dredging was performed in April 1957 to a depth of thirty feet plus two feet [1] below mean low water and ten feet off the fender piles.

The pier is a pile platform thirty feet wide and about 620 feet long. It consists of a concrete deck about ten inches thick supported on timber piles placed in lines called bents running the width of the pier. These bents are spaced at intervals of ten feet for the whole length of the pier.[2] The piles in each bent are spaced approximately four feet six inches on centers and are braced horizontally and diagonally. In general, each bent consists of seven bearing piles, one batter pile, one fender pile, a cross cap of twelve-by-twelve timber beams carrying the deck and a lateral bracing system. There are also some intermediate batter piles between bents.

The water slip where ships berth abuts the northerly side of the pier. Along the rear of the pier, distant thirty feet southerly from the face thereof, is a bulkhead running the entire length of the pier's underside. Beyond the bulkhead is miscellaneous fill consisting of sand, gravel, cinders, silt and other substances. The surface of the fill material is paved to a width of about twenty feet beyond the bulkhead, making a street adjacent to the pier deck.

The function of the bulkhead is to retain the fill. It consists of timber sheathing driven into the soil below the water and held in place by two timber wales— one just below the cap beam and the other at or below the low water line. The batter piles are secured to the top wale generally at five-foot intervals; in the instances where they are located at the bents they are also connected to the cap beams. The pressure or force actuated by the fill material, trucks using its surface and cargo stored thereon, if not resisted by an adequate counterforce on the water side of the bulkhead, would tend to move the pier structure out toward the slip rendering it unstable and unfit for use. The pier did become unstable and the conflict here centers about the cause. The plaintiff contends that the second dredging set in motion forces which resulted in the instability. The defendant, on the other hand, contends that deficiencies in the pier, antedating the dredging, were the cause.

About three weeks after the completion of the April 1957 dredging, there was subsidence of the fill area alongside of and for a distance of twenty feet beyond the bulkhead. The subsidence, or depression, adjacent to the bulkhead extended from the inshore bents to bent 45, and ranged originally from two inch-

---

1. A two-foot overdepth tolerance is the prevailing custom in the dredging trade in New York Harbor.

2. The bents are numbered, from inshore to outshore, D to A and 1 to 58; however, the claim for damages herein does not extend beyond bent 45.

es to a foot and progressively deepened as time went on. In addition, there was a lateral movement of the pier toward the water or slip side; the platform listed toward the water from three to four inches at one end to one and one half feet at the other. Eventually, the platform and various parts of the understructure were affected. Piles were dislodged and shifted from their usual positions of support for the pier structure. The bearing piles moved or tilted toward the slip; the batter piles, originally driven into the ground at an angle, straightened out, moved up and pushed against and into the asphalt and concrete decking of the pier and the deck platform was raised above the bulkhead sheathing. In end result the pier was rendered unstable and, to make it useable and workable, it had to be completely rehabilitated.[3]

Plaintiff, to prove its claim, relied upon the testimony of a soil engineer and other expert witnesses. The soil engineer made test borings in front of and under the pier and in the fill area. Among the matters which he determined were the nature of the various soil materials at different strata underneath the mud line,[4] the in-place shear strength value of the soil—i. e., its cohesive resistance, and the content of the fill material back of the bulkhead.

Based principally upon the soil engineer's testimony, the plaintiff's claim is that the dredging caused a massive rotational failure or slide of soil from south to north commencing at a point approximately twenty feet behind the bulkhead moving counterclockwise and passing through the average bottom elevation of the sheet pile bulkhead, through the area of the piles supporting the pier and out toward the slip. In the opinion of the plaintiff's expert the earth removed by

the 1957 dredging had, prior to its removal, served, together with other elements, as a sort of brake against a mass movement of soil. It was his view that before the dredging, the soil and other forces on the water side of the bulkhead were sufficient to resist the downward and outward pressure created by the fill material and various surcharges thereon[5]—that the factor of safety, as the experts term it, was then at least or greater than one—in substance, that the resistant forces counterbalanced the actuating forces exerting pressure, thereby preventing sliding or mass movement of soil.

The expert believed that the soil removed by the dredging off the face of the pier caused a sloughing off of the earth beyond it which could not sustain itself in a vertical slope, altered the soil contour and reduced the resistant forces below the actuating forces. He concluded that because of this imbalance, which resulted in reducing the factor of safety below one, a massive rotational slide or movement occurred which involved the entire soil area, including the bulkhead, the soil on the land side of the bulkhead and the soil on the water side. It was his judgment that this slide accounted for the subsidence behind the bulkhead, the lateral offshore movement of the pier structure and the dislocation of the batter and bearing piles. In sum, that the instability of the pier was a direct result of, and attributable to, the April 1957 dredging.

This conclusion and the theory upon which it was based were challenged by the defendant's expert, a design engineer of pier and waterfront structures. It was his opinion that the conditions which were responsible for the pier instability were all in effect long before the April

3. The rehabilitation work was done by a subsequent owner who had purchased the pier from Brooklyn. Brooklyn, however, reserved its right to bring this action, claiming its sale price had been reduced because of the damage.

4. The mud line, or slope line as it is sometimes referred to, descends from the

bulkhead underneath the pier and out toward the slip—and is the lowest point at which the water stops, i. e., the surface of the mud below the pier area and the slip area.

5. Surcharges include additional loads imposed by cargo storage, trucks and truck loadings.

1957 dredging and he rejected the analysis based on alteration of the soil support.

He contends that the pier had already deteriorated due to age and timber rot. His major premise was that the batter pile is the most important single item resisting the lateral force imposed upon the bulkhead and pier structure by the fill material, stored cargo and other charges [6]—that a batter pile, to function effectively as a resistant to the lateral load, must be properly connected to another unit. It was his view that the connections between the batter piles and upper wale and pile caps were defective and inadequate to transmit horizontal loads from the bulkhead to the batter piles; that this accounted for the lateral offshore movement of the pier, the tilting outshore of the batter piles and the lifting of the deck. He was of the opinion that the deficiency of the batter pile connections had existed from the time the pier was built, some thirty-seven years before the movement here in question. His considered judgment was that from the very inception the connections lacked (from a design standpoint) an adequate factor of safety to meet future contingencies.

While he conceded that there had been a movement of soil, he disputed that a massive rotational or circular slide had occurred.[7] He attributed the soil movement to the failure of the batter pile connections to hold the load, with the result that the sheathing and the fill behind it moved toward the slip. According to him, this was in progress long before the April 1957 dredging.

Each expert testified at length as to engineering, scientific and soil matters in support of his own conclusion and in opposition to the other's. Without attempting to detail their extensive technical explanations, their diametrically opposed positions may be pointed up by reference to the Court's effort to delineate the substance of their contentions in non-technical terms:

"THE COURT [to plaintiff's expert]: I have one or two questions to ask you in what I hope are lay terms. * * * I am trying to get away from some of the technical aspects of this matter.

"Do you attribute the failure of the stability of the pier after April, 1957, to the fact that the dredging was made within 10 feet of the edge of the pier?

"THE WITNESS: Not as such, your Honor. I attribute it to the new contour of ground that was assumed, obviously resulting from that dredging.

"THE COURT: In other words, you don't base your opinion on the mere fact that the dredging came within 10 feet of the edge of the pier?

"THE WITNESS: That is correct. That is exactly correct.

"THE COURT: Is it correct to say or is it your opinion that the soil mass which had been removed in the April 1957 dredging had acted as a sort of brake against the rotational slide?

"THE WITNESS: Yes.

"THE COURT: In other words, by the removal of a mass of soil that had been there it is your opinion that that resulted in the instability of the pier?

"THE WITNESS: That is correct.

---

6. According to the defendant's expert, other charges included the pull of moored vessels. Plaintiff's expert did not consider this a factor because in his opinion this lateral pull on the pier structure itself was not material to a soil failure analysis.

7. In his opinion, if a rotational slide had occurred, the batter piles would have turned inshore and not outshore. Plaintiff's expert agreed that this would be so if the soil failure had passed under the piles; however, it was the latter's conclusion that the soil failure did not go so deep and the bottom of the piles remained imbedded in nonmoving soil below the area of the slide.

"THE COURT: Now, is that stating it in simple language?

"THE WITNESS: That is very fine.

"THE COURT: To take it one step further, is it correct to say that once this, what I have referred to as a brake, or braking force, was removed, additional loading was imposed on the piles causing them to rotate and also imposing greater loads on the wales connecting the bulkhead and the pile structure?

"THE WITNESS: In essence that is correct." [SM 1370–72]

The differing position of defendant's expert appears from some excerpts of his testimony:

"THE COURT: May I direct your attention to the dredging in 1957, which as I have understood this record, came to within 10 feet of the edge of the pier; that is right, isn't it?

"THE WITNESS: That is right, your Honor.

*   *   *   *   *   *

"THE COURT: Now is it your opinion that the soil mass which had been removed in that area had acted as a sort of a brake against the rotational slide?

"THE WITNESS: No, your Honor, it did not. There was too small an amount of it to have acted as a brake—unless, as I have explained earlier, this structure was teetering from the start, which I do not believe it was. There were no signs of it. [SM 2096]

*   *   *   *   *   *

"THE COURT: Is it your opinion that the dredging had no relationship at all to the instability of the pier?

"THE WITNESS: That's right, your Honor.

"THE COURT: And that whether or not the dredging occurred the same end result would have existed, say, at the end of April 1957?

"THE WITNESS: Yes.

*   *   *   *   *   *

"THE COURT: * * * Your position is, as I understood your answer, that dredging the area away from the edge of the pier in April 1957 and coming to a point up to 10 feet from the edge of the pier had no effect at all insofar as the condition of stability was concerned or the instability which manifested itself after the dredging?

"THE WITNESS: I would want to modify one statement you made. I would rather say no appreciable effect so far as engineering is concerned.

"THE COURT: Was there any effect?

"THE WITNESS: A negligible amount as far as engineering is concerned.

"THE COURT: What do you mean by negligible as far as engineering is concerned?

"THE WITNESS: There does exist the possibility that when dredging occurred there might have been a slight sloughing off of material. * * *

"THE COURT: Could the dredging of April 1957 have accelerated the tendency of the pier structure to move out laterally?

"THE WITNESS: I would have to say no to that.

"THE COURT: Obviously there is a very sharp difference of opinion between the experts, isn't there?

"MR. QUINLAN: Yes, your Honor.

*   *   *   *   *   *

"THE COURT: You say even that sloughing off had no causal relationship to the instability of the pier after the dredging in April 1957?

"THE WITNESS: Yes, your Honor.

"THE COURT: There was no causal relationship of any kind inso-

far as that dredging of April 1957 is concerned, with the condition of the pier which developed thereafter?

"THE WITNESS: That's right, your Honor. * * * [SM 1843–47]

* * * * * *

"THE COURT: I think you have already answered the question generally in your prior testimony.

"Is it correct to summarize what you have just said by saying that even if the dredging of 1957 had not taken place, the failure or the instability of the pier would have manifested itself nonetheless?

"THE WITNESS: Yes, sir, your Honor, that is what I am saying.

"THE COURT: And do you say that it would have manifested itself to the same extent as had been indicated during the trial of this case following the dredging, if the dredging did not occur?

"THE WITNESS: Yes, your Honor, that is exactly what I would say.

"THE COURT: In other words, you say the dredging had no relationship of any kind to the instability of that pier?

"THE WITNESS: I think I had explained that once before when I corrected that statement by saying it had no appreciable relationship.

"THE COURT: You used the word 'appreciable' and I think at that time I questioned you about it. Did it have any relationship?

"THE WITNESS: I couldn't really say it had absolutely none because from a practical point of view we always like to think in terms of the straw that broke the camel's back. We know very well that a straw wouldn't break a camel's back, but if something is teetering, the slightest change could cause the failure, but in this particular case a structure that was standing 40 years wasn't teetering, in my opinion." [SM 2087–88]

■ As in all cases, this sharp conflict between the experts must be resolved by the trier of the fact. After observing the demeanor of all witnesses and after study and review of my trial notes, the entire transcript of the testimony, and the exhibits,[8] the Court concludes that the plaintiff has sustained its burden of proof.[9]

■ The Court finds that prior to the April 1957 dredging, Pier 3 was a safe, stable and useable pier, and that thereafter it was rendered unstable and in need of rehabilitation as a result of a massive rotational slide which was caused by the dredging operation. Prior to the dredging, extensive repairs had been made during 1954–56 both on the inshore side of the bulkhead toward a warehouse paralleling the pier and on the offshore side toward the slip. The repairs included posting piles,[10] replacing certain bearing and fender piles with new piles fifty to sixty feet long, renewing portions of the sheathing in the bulkhead, putting in new batter piles in some places, replacing pile caps wherever necessary, filling in the area toward the warehouse, levelling and repaving the area immediately behind the bulkhead for a width of twenty feet, and repaving the surface of the pier. This rehabilitation, which was completed in 1956 at a cost of over $150,000, put the pier and the adjacent street area in good condition. The fact is that from the time it was leased to International in 1956 the pier was workable and satisfactory and remained so until the April 1957 dredg-

---

8. The transcript of the testimony is in excess of 2,400 pages; the exhibits of the plaintiff and the defendant total almost 200.

9. Since technical matters were in issue, the Court, with the consent and in the presence of counsel, inspected the pier and its adjacent area.

10. Cutting off rotten or damaged parts and splicing new timber to the sound portions of the piles.

ing—a fact acknowledged by International's chief engineer in charge of maintenance and repair of the pier. There had been some subsidence behind the bulkhead after the repairs and prior to the April 1957 dredging, but this was localized and not due to any movement of the pier toward the slip. So too, there was a bow in the pier on the water side prior to the dredging, but this bowing dated back to original construction and was not of the marked degree or bulge that existed thereafter.

Upon all the evidence, the Court is persuaded that the April 1957 dredging brought into play forces which led to the instability of the pier and plaintiff is entitled to recover the damages sustained by reason thereof.

█ █ The question remains as to the amount of damages and, here too, there is wide divergence of opinion. Another expert witness called by the plaintiff estimated the cost of rehabilitation of the pier at $502,283, but I am satisfied that this estimate contemplated building an entire new structure and disregarded the obsolescent condition of the pier when damaged. The defendants, if cast in liability, are not required to pay for a new and modern pier. Plaintiff is entitled to be made whole for the damage caused to the pier as it existed—that is, an award necessary to restore the pier to its condition as of the damage date.[11] Plaintiff's pier had been constructed in 1920 and even after taking into account the extensive repairs made prior to its leasing to International, its prospective life was approximately ten years. The defendant's expert who had examined the pier several months after the damage estimated the cost of restoring the

pier and adjoining area to a safe and workable condition, as of the time of the dredging, at approximately $130,000. I regard this as a more realistic figure than that submitted by plaintiff's expert. However, this sum includes $23,840 for contingencies computed at 25% of the estimated cost of $94,550 (exclusive of engineering fees). This contingency estimate appears somewhat excessive; the Court is of the view that 10% ($9,455) represents a fair and reasonable allowance for this item, bringing the total up to $104,005. From the foregoing gross amount there should be deducted $3,250, now included in the overall estimate for regrading and paving the area behind the bulkhead, yielding a basic figure of $100,755, upon which sum the 10% for engineering services ($10,075) should be based, making a grand total of $110,830. The regrading and paving item has been disallowed since title to the area or street behind the bulkhead was in the City of New York. While it is true plaintiff used this area, which was referred to upon the trial as a marginal street, there was no showing that it was obligated to maintain or repair it or had any other duty with respect thereto. Any claim for damage exists in favor of the City.[12] Accordingly, judgment may be entered against both defendants in the sum of $110,830 with interest from the 25th day of April, 1957, when the dredging was completed. The amount of the damage is within and does not exceed the amount of the coverage under the policy issued by the defendant Fireman's Fund Insurance Company.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

11. McCormack, Damages 560 (1935). Cf. Weirton Steel Co. v. Isbrandtsen-Moller Co., 126 F.2d 593, 594 (2d Cir. 1942).

12. See New York City Charter (1936) §§ 291(4), 383, 705; New York City Ad-

ministrative Code, § 704d–1.0. See also, In re Piers Old Nos. 8, 9, 10, and 11, North River, 228 N.Y. 140, 126 N.E. 809 (1920).