**HINFIN REALTY CORPORATION,**
Plaintiff,

v.

**M/V POLING BROS. #7 et al.,**
Defendants.

**Civ. A. No. 70 C 1395.**

United States District Court,
E. D. New York.

Oct. 11, 1972.

John P. Conroy, McHugh, Heckman, Smith & Leonard, New York City, for plaintiff.

James R. Williams, D'Amato, Costello & Shea, New York City, for defendants.

## MEMORANDUM OF DECISION

NEAHER, District Judge.

Plaintiff, Hinfin Realty Corporation ("Hinfin"), brings this action in admiralty[1] to recover damages allegedly

---

[1]. Jurisdiction is grounded on 46 U.S.C. § 740, which reads in pertinent part

The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.

caused to its dock and terminal by the negligent operation of a vessel owned by defendant Poling Transportation Corporation. After trial upon the facts the court finds for the plaintiff.

## FACTS

Hinfin, a New York corporation, is the owner of a waterfront bulkheaded dock and oil terminal located in Glenwood Landing, New York. It leases these facilities to Harbor Fuel Co., Inc., a local fuel distributor. The property, situated on the eastern bank of a channel in Hempstead Harbor, is bounded on the north by the Long Island Lighting Company ("LILCO"). LILCO also has a shorefront bulkhead which forms a continuous line with plaintiff's dock.

Hinfin's original bulkhead was constructed in 1929. Steel sheeting, 18 inches wide, was pile driven into the harbor bed and bolted near the top to horizontal steel bars ("whalers"). The whalers in turn were anchored by two-inch diameter steel tie rods to chestnut or locust hardwood piles ("deadmen") sunk 40 feet east of the bulkhead. The tie rods prevented the sheeting from buckling outward when the excavation between the bulkhead and deadmen was packed with fill. The flow of subterranean springs, running from the high ground to the harbor, was collected by open-jointed tile pipes imbedded in the subsoil. The pipes, inserted in holes cut through the bulkhead, discharged the run-off water into the harbor.

In 1955 the sheeting showed extensive signs of corrosion and Hinfin decided to extend its dock slightly to the west of the old bulkhead to form a continuous line with LILCO's contiguous bulkhead to the north. Hinfin contracted J. Richard Steers, Inc., an engineering firm specializing in large marine construction, to perform the reconstruction. Steers excavated behind the old bulkhead, inspected the whalers and tie rods and found them to be in good shape. Sections of interlocking z-shaped steel sheeting 40 inches wide were then pile driven 16 feet into the loam-bottomed channel four feet west of the old bulkhead. The sheeting was bolted together, five feet from the top, by horizontal T-bar whalers. The new sheeting was held in position by tie rods fastened to both the old and new whalers. In order to permit the run-off of water from the springs metal pipes were fastened to the discharge holes in the old bulkhead and extended through holes cut in the new sheeting. Wooden piles for mooring ships were driven between the old and new bulkheads and the area was back-filled. Construction was completed by topping the new bulkhead with wooden stringpieces. Plaintiff drove 300 feet of sheeting for the northern half of the dock in 1955 and completed the 300-foot southern portion in the same manner in 1959.

The harbor channel is trafficked by ships delivering petroleum and other products to both plaintiff's and LILCO's facilities. Approximately 320 ships a year berth at Hinfin's dock.

At the dock the distance between the channel bed and the stringpieces measures 24 feet and the mean low water mark 12 feet. Distant 305 feet west of plaintiff's dock the highpoint of a sandbar protrudes two feet above the mean low water mark. From there the bar slopes into the channel until, 235 feet from the bulkhead, the water reaches a mean low water depth of eight feet. To the north of plaintiff's dock the channel spreads slightly and forms a ship-turning basin which is marked by a buoy.

At 0300 hours on August 25, 1969, the M/V Poling Bros. No. 7 ("No. 7"), a coastwise motor tanker owned by Poling Transportation Corporation and captained by Thomas Cassidy, left Port Reading, New Jersey to deliver a cargo of gasoline to Harbor Fuels, Inc. No. 7, a steel tanker with a length of 253 feet and a breadth of 40 feet, is powered by two 1800-horsepower diesel engines. Each screw measures 3½ feet in diameter. The vessel has a gross tonnage of 1235 tons and can carry approximately 700,000 gallons of gasoline. On August

25, No. 7, carrying 570,000 gallons, drew 11 feet forward and 11'6" aft.

Between 0700 and 0730 No. 7 entered the channel above LILCO's dock, passed through the turning basin and pulled abreast of the north end of Hinfin's bulkhead. At 0700 the tide had risen 3'4"[2] above the mean low water mark giving the channel a depth of 15.15 feet at plaintiff's bulkhead. Cassidy swung No. 7's bow to the west in an attempt to turn and berth with the bow facing north. The maneuver was to be completed by running the prow onto the bar and pivoting the stern to the south. Unfortunately the water was insufficiently deep to permit the ship far enough onto the bar to allow the stern to clear plaintiff's bulkhead.

When he attempted the turn, Cassidy was in the pilot box, 100 feet aft of the bow and 18 feet above the main deck. He admitted he could not see whether the ship would clear the bulkhead and posted a watch, Lewis, on the stern to notify him if the turn could not be completed. Cassidy also testified he had previously made similar turns off the Hinfin dock, although at a spot slightly to the north and at times when the tide was higher. He contended the turn could have been successfully completed if the water had been one foot deeper. Despite the crucial nature of the water's depth and his admission that he did not know how much water covered the shoal, Cassidy sent no one forward to take a depth reading.

Robert Sofield, then an employee of Harbor Fuel Co., Inc., testified that on August 25, 1969 he observed No. 7 approaching the Hinfin dock at about 0700. It swung its prow in the direction of the bar, the stern pivoted from north to south and came to rest with its port side against the bulkhead. The boat's screws were churning up sand from the channel bottom and throwing water up the stern of the ship. This continued for 10 minutes until the stern of the ship moved 15 feet from the bulkhead. The engines then stopped and the stern came to rest in its original spot against the dock. The ship again ran its engines for five minutes, this time throwing water over the ship's deck and causing the pier to shake. Its engines again stopped, re-started and the ship moved slowly away from the bulkhead. No. 7 finally berthed with its bow south.

James W. Feeny, an operating engineer employed by Long Island Asphalt, a company located adjacent to the Hinfin dock, corroborated Sofield's testimony. He saw the tanker "boiling up water" for five to eight minutes while touching the bulkhead and 15 minutes later again saw shells and sand being churned up off the channel bottom by the ship's screws.

Cassidy and Lewis admit the vessel attempted to turn in the location testified to by Sofield but differ as to the wash of the props and the length of time the ship's screws were turning while adjacent to the pier. Cassidy said No. 7 spent no more than five minutes on the bar. He also testified that while attempting to pivot he ran the port screw ahead, sometimes at full throttle, and the starboard screw astern. He admitted he could not see whether or not the stern actually touched the bulkhead but recalled a phone call from Lewis telling him the stern would not clear the pier. Lewis, positioned on the top deck, about 25 feet above the main deck, testified the maneuver lasted about five minutes and recalled no water splashing over the main deck of the ship. Lewis and Cassidy both testified that after five minutes No. 7 backed to the north and then pulled slightly south to berth next to the gasoline discharge connections. At 1515, No. 7, having finished her discharge, backed down the channel, swung around in the turning

2. See certified copies of tidal conditions produced from records of Offices of the National Oceanic and Atmospheric Administration, United States Department of Commerce. Plaintiff's Exhs. 14, 15, 16.

basin and returned to the Poling Bros. dock on Staten Island.

At 2130 in the evening of August 25, James W. Finlayson, President of Hinfin Realty Corp., received a call from an employee, Ed Douglas, reporting extensive damage to the bulkhead. He went to the pier and observed 60 feet of sheeting bulging westward from the top into the channel, tie rods pulled from the whalers, stringpieces sheared, the pipe used to carry water from the subterranean springs dislodged from its place in the outer bulkhead and fill escaping through the vacant discharge hole. To the east of the bulkhead a recently poured reinforced concrete curb had cracked in several places and settled almost a full foot.

On the morning of August 26, 1969, Edward Dalidowicz, an employee of Harbor Fuel, took soundings off the bulkhead and found the distance between the stringpieces and the harbor bed measured 34 feet, an increase in depth of 10 feet. It is plaintiff's contention that the propeller action of No. 7 dredged a deep hole in the harbor bed in front of the bulkhead, thereby removing the soil which anchored the sheeting and causing the bulkhead to collapse. Although Dalidowicz's reading reflected an excavation of only 10 feet, plaintiff asserts the scouring was even deeper before being partially covered by fill seeping through the exposed discharge hole. Defendant counters that the damage was not caused by No. 7 but was the cumulative effect of strain exerted on the sheeting by the many vessels which tied up to the piles between the bulkheads.

Plaintiff maintains its dock was safe, stable and useable prior to No. 7's berthing on August 25. Finlayson testified regular inspections disclosed no serious damage or evidence of disrepair to the dock prior to its collapse and that any minor damage to the stringpieces had been promptly repaired. He also asserted the sheeting above the mean low water mark had received four or five coatings of a bitumastic compound between 1955 and 1969. Also the frequently creosoted stringpieces had been sandblasted and completely recoated in 1968.

Extensive testimony was given by Finlayson and Steers as to the bulkhead's condition prior to the accident. As noted above, an inspection of the old tie rods and whalers in 1955 showed them to be in proper condition. In 1968 Steers removed plugs from the new bulkhead to measure corrosion and found it insignificant. Also he found no serious wastage (corrosion) on the whalers, tie rods or bulkhead after the collapse.

Steers, plaintiff's expert witness, testified that the dredging by No. 7's propellers removed the braking effect of the channel bed on the bulkhead, permitting the sheeting to move out slightly at the bottom. This precipitated a rotational earth movement which placed increasing stress on the tie rods, causing them to snap or pull out of the whalers, allowing the top of the sheeting to bulge westward. He also said the movement caused the drainage pipe to become dislodged, permitting back fill to seep out and partially fill the hole.

Defendants' expert witnesses testified the rust found on the tie rods and the absence of scratches of recent origin on the whalers indicated the tie rods had failed prior to August 25. They attributed their failure to the stress exerted on the bulkhead by the numerous ships that berthed to discharge gasoline.

Edward F. Ganley, a marine surveyor and naval architect, testified No. 7's propellers unquestionably scoured the bottom to some extent but could not have dredged a hole as deep as indicated by Dalidowicz's soundings. His opinion was based on a theory formulated while observing a salvage operation in the Turkish Gulf. Ganley said a ship will scour the bottom when the water's depth beneath the keel is less than half the ship's draft. Assuming the water's depth to be 15.15 feet at 0730, Ganley calculated the distance between the bottom of the ship and the channel floor to

be 3.65 feet. Although he claimed significant scouring would occur if the depth was less than 5.75 feet he still asserted the churning of No. 7's propellers could not have dredged out a hole in excess of 10 feet.

As noted, Ganley's theory was based on the scouring effect of a ship in the Turkish Gulf. However, no samples were taken of the Gulf's bed so no true comparison can be drawn between it and Hempstead Harbor. Furthermore his theory was based on the scouring effect of a ship floating on an even keel and in the instant case Ganley admitted No. 7's stern went down when Cassidy ran her bow onto the sand bar. He also testified that although the allegedly broken tie rods might have eventually caused the pier to collapse, evidence of the condition would have appeared and repairs could have been made.

Taking this in conjunction with Finlayson's uncontroverted testimony that the dock was inspected regularly and showed no signs of weakness or disrepair, the court finds that the condition of the tie rods observed by defendants' experts 16 days after the collapse was not the proximate cause of that collapse. Viewing the evidence as a whole in light of Ganley's concession that if Sofield's version of No. 7's maneuver was correct, a scouring of the bottom did occur which contributed to the collapse, the more rational inference is that the scouring was in fact its proximate cause.

### NEGLIGENCE

■ The court therefore finds, as did Judge Weinfeld in Brooklyn Waterfront Terminal Corp. v. International Terminal Operating Co., 211 F.Supp. 702, 707 (S.D.N.Y.1962), that prior to August 25, the Hinfin facility ". . . was a safe, stable, and useable pier, and that thereafter it was rendered unstable and in need of rehabilitation as a result of a massive rotational slide which was caused by the dredging operation." There is no question that the dock was constructed and maintained in such condition as to be able to withstand ". . . [the] frequent and long-continued subjection to the [wash] of passing steamers . . . ." James Shewan & Sons v. New England Navigation Co., 155 F. 860, 863 (E.D.N.Y.1907). Thus no allegation of contributory negligence may be seriously considered based upon the rusted condition of a few tie rods exposed to view as a result of the collapse. Significantly, the bulkhead breakout occurred in the immediate area of the scouring and nowhere else.

■ Furthermore defendants' failure to ". . . show that it was not in [the ship's] power to prevent the injury by any practical precautions . . .", O'Donnell Transportation Co. v. M/V Maryland Trader, 228 F.Supp. 903, 909 (D.C., 1963), makes them liable for the cost of repair. See also West India Fruit & S. S. Co. v. Raymond, 190 F.2d 673, 674 (5 Cir. 1951). No. 7 was obligated to ". . . take into consideration the reasonable effects to be anticipated from its speed and motion . . ." and was also required to ". . . take such precautions by way of reduction of speed or alteration of course . . ." as was necessary to prevent damage. O'Donnell Transportation Co. v. M/V Maryland Trader, *supra* at 909, and cases cited therein.[3] Cassidy neglected to do so by (1) not swinging about in the turning basin before berthing at plaintiff's pier; (2) failing to take a depth reading on the shoal although he realized the ship's ability to clear the pier was contingent on the lev-

---

3. Cases cited by defendants regarding standard of care are inapplicable. Dalldorf v. Higgerson-Buchanan, Inc., 402 F.2d 419 (4 Cir. 1968), deals with the duty of a dredging company to warn ships of a perilous situation; Metzger v. SS Kirsten Torm, 245 F.Supp. 227 (D.C.Md. 1965), concerns liability under the Maryland "Lord Campbell's Act", Anno.Code of Md., 1957 ed., Art. 67, §§ 1–6; and Atlantic Gulf & Pacific Co. v. Barney Turecamo, 202 F.Supp. 31 (S.D.N.Y. 1965), involves towage liability.

el of the tide; and (3) running his engines at full throttle while adjacent to the bulkhead. His lack of due care must also be considered compounded by the fact that he had berthed at Hinfin's bulkhead on prior occasions and was familiar with the depth and topography of the channel.

## DAMAGES

Plaintiff contracted J. Richard Steers, Inc. and Hinkle & Finlayson, Inc. to repair the dock. An attempt to pull in the sheeting by use of a turnbuckle failed and they were forced to remove the sheeting, redrive the salvageable sections and replace the rest. Steers submitted a $32,665.36 itemized bill [4] covering labor and materials necessary to restore the bulkhead to its prior condition. Hinkle & Finlayson, Inc. charged $8,261.93 [5] for labor and material used to repair the bulkhead and $2,200.00 [6] to restore the damaged loading lines, concrete curbing and road paving.

Defendant does not contend the repairs are excessive but claims the court should apply a credit taking into account the depreciation of the dock.[7] The general rule of damages in admiralty is *restituto in integrum* and ". . . damages assessed against the respondent shall be sufficient to restore the injured [property] to the condition in which [it] was at the time the [damage] occurred. . . ." The Baltimore v. Rowland, 8 Wall 377, 75 U.S. 377, 385–386, 19 L.Ed. 463 (1869). "[W]here repairs are made which require the installation of new parts . . . to restore [the property] to the condition in which [it] was before a collision for which another is responsible, the party liable can not be given credit for the difference between the value of the [property] necessarily so repaired and what its value would have been had the old, but still good parts, which the collision made unsuitable for continued use been undamaged." Shepard Steamship Company v. United States, 111 F.2d 110, 113 (2 Cir. 1940). See also Oakdene Compress & Warehouse Company v. S/S Cities Service Norfolk, 242 F.Supp. 148, 150 (E.D.N.C.1965).[8]

The rule is ". . . justified by the consideration that the plaintiff should not be required to finance in part the premature replacement of equipment when there is no assurance that this will add to the realizable value of the property to which it appertains . . . [unless] this would be clearly inequitable, e. g., in a case where the damaged part was scheduled for early replacement; long before the useful life of the whole." United States v. Ebinger, 386 F.2d 557, 561 (2 Cir. 1967). Defendants claim they fall under the exception in Ebinger since ". . . the badly deteriorated and constantly used 60-foot section of the plaintiff's wharf would certainly have needed a replacement long before the expiration of the useful life of the whole or entire structure . . ." (Defendants' Supplemental Memorandum of Law, p. 6).

There was no evidence at trial that the collapsed section of Hinfin's dock was in an advanced state of disrepair or slated for early replacement. Indeed there was uncontroverted testimony by Steers and Finlayson that plugs taken from the sheeting in 1968 showed no

---

4. Plaintiff's Exh. 5.

5. Plaintiff's Exh. 6.

6. Plaintiff's Exh. 7.

7. Defendants assert the credit, if granted, should be predicated on the estimated useful life of the pier used in calculating depreciation under the Internal Revenue Code of 1954, 26 U.S.C. § 167. This is incorrect. The dock's actual useful life is 50 years. Plaintiff selected an ac-

celerated method of tax depreciation, using a useful life of 20 years, because it holds part of its property under a 20-year lease from the Town of North Hempstead.

8. But see Allied Chemical Corporation v. Edmundson Towing Co., 320 F.Supp. 448 (E.D.La.1970); Rawls Bros. Contractors, Inc. v. United States, 251 F.Supp. 47 (M.D.Fla.1966).

**1398**

evidence of corrosion and that the sheeting was still corrosion free after the accident. Defendants assert this section would have required early replacement due to the large volume of ships berthing at the discharge pipes. But the berthing had caused no corrosion and defendants' own expert witness testified any possible damage caused to the tie rods could have been seen and repaired, preventing a collapse. Thus defendants receive no credit [9] and shall be held liable for the cost of restoring plaintiff's bulkhead to its condition immediately prior to August 25, 1969. Accordingly, the Clerk is directed to enter judgment against the defendants in the sum of $43,127.29 with interest from August 25, 1969.

The foregoing sets forth the court's findings of fact and conclusions of law for purposes of Rule 52, F.R.Civ.P.

---

9. Defendants cite language in Oakdene Compress & Warehouse Company v. S/S Cities Service, Norfolk, *supra*, and Brooklyn Waterfront Term. Corp. v. International Term. Op. Co., *supra*, to support his claim for credit. Such language is only apposite when the dock is obsolescent or deteriorated, which is not the case here. Indeed *Brooklyn Waterfront, supra* at 708 made clear

Plaintiff is entitled to be made whole for the damage caused to the pier as it existed—that is, an award necessary to restore the pier to its condition as of the damage date.