## Pennsylvania Power & Light Co. v. Decker

*Shant J. Harootunian*, for plaintiff.
*John B. Backenstoe*, for defendant.

KOCH, *P. J.*, March 29, 1966—This is an action in trespass commenced by Pennsylvania Power & Light Company, a public utility, against Frank Decker, Jr., the owner and operator of a 1961 Chevrolet which struck a utility pole owned and maintained by plaintiff in the Township of Whitehall, Lehigh County, on December 15, 1962, at 4:20 a.m.

In light of the fact that the complaint seeks the recovery of $228.43, this controversy would ordinarily be submitted to a board of arbitrators pursuant to Lehigh County Rule 540. However, upon petition of both parties which averred that the only matter in dispute concerned the measure of damages and that

this issue was one of "first impression" in the Commonwealth, we agreed to hear the matter without a jury. Susequently, the parties filed a stipulation of fact and the matter is now before the court for final determination. This stipulation acknowledges liability on the part of defendant and, as already indicated, the only question before us relates to the measure of damages.

In order that our conclusion may be clearly understood, we shall outline the stipulated facts in more detailed than is ordinarily justified.

Plaintiff utility possesses in excess of 700,000 poles in its system which, together with cables, conductors and other items, make up its system for transmitting and distributing electrical energy. The stipulation provides that the doctrine of de minimis non curat lex is inapplicable because the issue before us is one of a recurring nature. For example, in the year 1962 there were 106 occasions upon which poles were damaged in Lehigh County and, upon the basis of plaintiff's calculations, the cost of repairs was $17,770.74.[1]

The stipulation also sets forth that plaintiff accrues for accounting and rate purposes annual depreciation on the basis of an average life of 30 years, or 3.3 percent on each dollar of original cost investment in poles on its books irrespective of the age of a

---

1. Paragraph 10 of the stipulation provides, in part, as follows:

"The number of motor vehicles contacts causing damage to poles and the cost of repairs throughout the 29 counties in which plaintiff operates indicates the following:

| Year | Number of Occasions | Cost of Repairs |
|------|---------------------|-----------------|
| 1962 | 1337 | $204,479.00 |
| 1961 | 1356 | 195,538.77 |
| 1960 | 1388 | 213,395.63 |
| Total | 4081 | $613,413.40" |

pole. It is important to observe, however, that, in spite of this 30-year basis, the parties agree that poles are retired for many reasons in addition to motor vehicle damage. These reasons may be summarized as follows: (1) Natural catastrophe; (2) requirements of public authorities in such areas as highway construction, airport construction and expansion, urban renewal and flood control projects: (3) sale of facilities to other parties; (4) obsolescence due to loss of customers, abandonment of service or introduction of other facilities to perform the same function, and, (5) physical deterioration.

The parties further stipulate that the fair market value of a pole *in place* is indeterminate, since the pole is merely part of a system of distributing and transmitting energy, said part being nonsalable.

The particular pole struck by defendant's vehicle was installed in 1961 and in that year the average cost for poles of this type, installed, was $92.71. In 1962, the year of the accident, the cost was $104.28. At argument, plaintiff's counsel stated that this and other damaged poles had no salvage value.

Paragraph 11 of plaintiff's complaint avers that, in order to comply with its duties as a public utility, it was required to perform the following acts:

(a) correct the hazard to the life, limb and property of its patrons, employes and the public;

(b) restore its facilities to safe service;

(c) restore street lighting in Whitehall Township;

(d) make temporary emergency repairs;

(e) remove the damaged facilities;

(f) install replacement facilities;

(g) transfer and reconnect facilities;

all without unreasonable interruption or delay.

Plaintiff's demand is comprised of the following items:

$165.02   for labor at straight time
 10.49   for labor at overtime
 32.60   for material[2]
 12.31   for transportation
  8.01   for employees' meals
$228.43

Plaintiff maintains that the measure of damages which we should apply in determining the amount of the recovery for this component of its electrical distribution system is the total of $228.43.

Defendant's position is that the proper measure of damages is "100% of all extraordinary costs incurred by reason of the injury plus all other costs occasioned in making the replacement, properly weighed to reflect a depreciated credit less the salvage value, if any." Nowhere in defendant's brief is there any conclusion as to what the amount of the recovery should be as a result of applying these principles. However, since we are of the opinion that plaintiff is entitled to recover the full amount of its claim, this omission is of no consequence.

The basic principle concerning damages for wrongful injuries to property requires little discussion: The injured party is entitled to such recovery as will compensate him fully for the losses which are the proximate result of the wrongdoer's negligent or wrongful act or omission: 22 Am. Jur. 2d Damages §131 (1965). The objective is to restore plaintiff, as nearly as possible, to his former position and he may, therefore, recover the actual loss sustained.

The stipulated facts persuade us that there is another general principle which is applicable. It is stated as follows in 22 Am. Jur. 2d, Damages §131:

---

2. The plaintiff's complaint does not identify the material but for the purposes of this decision we find this to be the cost of an uninstalled creosoted yellow pine pole.

"Such difficulty as there is arises, not in stating the general rule, but in applying that rule to specific cases. There are countless types of property, both tangible and intangible; there are scores of differing classifications of interests in that property, ranging from fee simple ownership to rights of possession; and there are many different kinds of injuries to property and the interests therein. Further, many decisions are the result of a failure, on the part of the attorney presenting the case, to present proper proof of damage on which the opinion of the court can rest. Courts are agreed, therefore, that there is no fixed or inflexible rule for determining the measure of damages for injuries to, or the taking, detention, or destruction of, property in every case. The amount to be awarded depends upon the character of the property and the nature and extent of the injury, and the mode and amount of proof must be adapted to the facts of each case. In ascertaining the damages to be allowed, the jury may consider all the circumstances connected with the injury."

This issue cannot be resolved by simply applying the general rule concerning damaged motor vehicles. In such case ordinarily the measure is the cost of repairs and, if such cost exceeds the value of the car, the plaintiff is limited in recovery to the difference in value before and after the accident. The point is that in the case of utility systems there is no market value and, consequently, the only alternative is to allow the cost of repairs. That there is a distinction between utility and other types of property was recognized by President Judge Neely in Pennsylvania Power & Light Co. v. Scheib, 79 Dauph. 58 (1962):

" . . . we would think that repairing of the damage to a portion of a railroad's trackage, for example, would receive different consideration from the re-

pairs of damage to a chattel, an automobile for example. In the latter instance, consideration need only be given to an individual chattel. In the former instance, the damaged rails are but a small part of the whole system performing a vital public need. Whether plaintiff's light standard should be considered by analogy as like the railroad or the automobile is for the trial court".

A decision of the Supreme Court of NorthCarolina in 1964, Carolina P. & L. Co. v. Paul, 261 N.C. 710, 136 S.E. 2d 102 (1964), expresses our view. In that case, plaintiff utility sued for the cost of repairs less the salvage value of the replaced parts. This amounted to $182.65. Defendant sought a credit for depreciation, claiming that the utility installed a new pole and new transformer. The Supreme Court affirmed the lower court's conclusion that the damages recoverable were the actual out-of-pocket expenses of repairs and replacement. The court held:

"North Carolina is committed to the general rule that the measure of damages for injury to personal property is the difference between the market value of the damaged property immediately before and immediately after the injury. The purpose of the rule is to pay the owner for his loss. If the damaged article has market value, the application of the before and after rule is relatively simple. Even in that case, however, the cost of repairs is some evidence of the extent of the damage. Simrel v. Meeler, 238 N.C. 668, 78 S.E. 2d 766. However, if there is no market, there can be no market value. The foundation for the before and after rule is lacking. Cost of repairs is then about the only available evidence of the extent of the loss. Ordinarily, power systems are not on the market. Less so are small component parts of the system.

"The authorities on damage recognize the difficulty of fixing damages for the type of injury here involved. The following appears in McCormick, Damages, p. 166. §44, 3rd ed.: 'The expression "market value" in this latter instance becomes a vague ideal rather then a reasonably definite standard, The notion that there is a "market" for such a unique property stretches the metaphor almost to the breaking point'."

Our research reveals no Pennsylvania appellate decision involving the precise question before us. Other jurisdictions, in addition to North Carolina, have resolved the matter and adopted the views of plaintiff. We regard the case of New Jersey P. & L. Co. v. Mabee, 41 N.J. 439, 197 A.2d 194 (1964), as expressing what we believe to be the more logical and just conclusion. There the utility sued for $1,317.94, the cost of its repair bill. The pole was 20 years old at the time it was struck by defendant's vehicle. There was a stipulation that the life expectancy or useful life of the *average* pole was 36 years. Defendant maintained that the damages recoverable should be based on the reproduction cost less depreciation based on the used life of the old pole. Defendant acknowledged that the depreciation deduction would not apply to the repairs made during overtime hours. Since $220.56 was spent for overtime labor, defendant argued that the amount recoverable was $708.29, comprised of $220.56 for overtime labor and 16/36 of all repair costs. The court rejected defendant's theory, stating, 41 N.J. 444, 197 A.2d, 195-96:

"It is not feasible to prove the value of the whole circuit before and after the accident and of course no such evidence was offered. Both sides necessarily started with the cost of repairs. The need for the work

done is not disputed. It is not suggested that any lesser expenditure would have sufficed to make good the damage done. Rather defendants argue that the work thus necessarily done served not only to make good the damage inflicted but also to confer upon plaintiff a further benefit for which there should be an appropriate reduction.

"It seems to us that the true issue is whether the replacement of the pole did more than make plaintiff whole and whether, if it did, it would be just to make the victim of the wrong contribute so much of the cost as would reflect that further benefit.

"If the life of every pole were 36 years and if it were clear that each pole would be replaced at the end of that period, defendants could well urge that a new pole clearly conferred a benefit beyond the amount of the damage done. *The difficulty is that there is no discernible life expectancy of an individual pole and that although the period of 36 years is used for accounting purposes, the pole that was destroyed might well have served for a much longer period and the new pole may last for but a few years. Moreover, because of changes in circumstances or in technology, it cannot be known whether the pole would ever have been replaced.* In short, at least upon the record before us, we cannot say with reasonable assurance that the installation of a new pole did more than remedy the wrong done. An injured party should not be required to lay out money, as defendants' approach would require, upon a questionable assumption that one day its worth will be recaptured." (Emphasis supplied.)

Similar views have been expressed by the Court of Appeal of Louisiana in Southwestern Elec. Power Co. v. Canal Ins. Co., 121 So. 2d 769 (La., 1960). There, the court stated:

" . . . The contention of counsel for appellant is that forasmuch as the pole is depreciated over a period of thirty years upon the books of the company that all items of expenses incurred by plaintiff should be depreciated over the same period of time and plaintiff, in fact, should be permitted on account of these other items the sum of $52.40 and no more. *The total expenses incurred by plaintiff were actual, direct out-of-pocket expenses incurred by reason of the tortious act. Plaintiff is, in our opinion, entitled to recover its actual loss in wages and material and is entitled to be restored in the same position it was prior to the accident.*" (Emphasis supplied.)

We have considered the case of Niagara Mohawk Power Corp. v. Smith, 202 N.Y. Supp. 2d 794 (1969), a memorandum decision of the Appellate Division, New York. There, the extraordinary expenses were allowed but depreciation was applied in the computation of the remaining damages. Defendant in the case at bar relies upon this decision, but we believe that the decisions in North Carolina, New Jersey and Louisiana are more consistent with the general principles of measure of damages in this Commonwealth.

Defendant has directed our attention to such cases as Brooklyn Waterfront Terminal Corp. v. International Terminal Operating Co., 211 F. Supp. 702 (S. D. N. Y. 1962), plaintiff's waterfront pier was damaged by defendant's dredging operations. The court held that plaintiff was entitled to be made whole for the damage to the pier as it existed, that is, to an award of a sum necessary to restore the pier to its condition as of the damage date but would not be entitled to recover the cost of a new and modern pier. We do not believe that the facts in the Brooklyn Waterfront case can be compared to the issue before us. There, an entire pier was damaged and the tradi-

tional measure of damages was obviously applicable for the reason that plaintiff would have been unjustly enriched if its concept of damages had been accepted. In the case at bar, a small component of a large system required replacement and it cannot be said that there was an unjust enrichment. Similarly, our courts have not regarded a plaintiff as being unjustly enriched when his five-year-old vehicle has been damaged and defendant is obliged to meet the cost of certain *new* parts to restore the vehicle. Depreciation principles have not been applied in such cases, and we are of the opinion that they should not be given consideration here.

### DECISION AND ORDER

Now, March 29, 1966, the court finds in favor of plaintiff, Pennsylvania Power & Light Company, and against defendant, Frank Decker, Jr., in the amount of $228.43.

It is ordered that this decision be filed and if no exceptions are filed within 20 days after service hereof upon counsel, the prothonotary shall enter final judgment upon the decision.