BROWN & ROOT MARINE OPERA-
TORS, INC. and Brown & Root, Inc.,
Successor to Brown & Root Marine Op-
erators, Inc., Appellants,

v.

ZAPATA OFF–SHORE COMPANY,
Appellee.

No. 23747.

United States Court of Appeals
Fifth Circuit.

April 24, 1967.

Robert Eikel, Eikel & Goller, Houston,
Tex., for appellants.

James K. Nance, R. Gordon Gooch,
Houston, Tex., for appellee Zapata Off-
Shore Co., Baker, Botts, Shepherd &
Coates, Houston, Tex., of counsel.

Before GEWIN, COLEMAN and GOLDBERG, Circuit Judges.

COLEMAN, Circuit Judge:

Brown & Root Marine Operators, Inc.,[1] as owner of the barge MM-71, filed a libel and petition for exoneration or limitation of liability, civil and maritime, for damage to the offshore gas well equipment of Zapata. The case was tried to the Court below without a jury. The Court filed findings of fact and conclusions of law in an interlocutory decree. It held Brown & Root liable and (as we read the decree) denied limitation unless Brown & Root should surrender two other vessels in addition to the MM-71. This appeal is taken from the interlocutory decree. We affirm.

The Court found that Brown & Root entered into a contract with Zapata Off-Shore Company prior to July, 1959. Under the contract Brown & Root was to perform labor and furnish material for constructing and erecting platforms and walkways and laying pipelines at gas wells #1 and #3, Block 86, Vermilion Parish area in the Gulf, off the coast of Louisiana. In carrying out the contract, Brown & Root employed several of its vessels, notably the barge MM-71, the derrick barge H. A. LINDSAY, and the tug PAN-AMERICA.

The testimony indicated the MM-71 was about 170 feet long. It carried materials for the contract work and served as a welding platform. It was not self-propelled nor permanently manned. The barge H. A. LINDSAY, also non-self-propelled, served as headquarters vessel for the operation. The attending tug PAN-AMERICA moved the two barges, personnel, and materials from place to place as needed.

The MM-71 and the other vessels arrived in the vicinity of Zapata #1 and #3 July 22, 1959, a Wednesday. Work

began that day, but broke off in the afternoon because bad weather developed. The radio forecasts from shore were for worsening weather conditions.

On Thursday, July 23, the MM-71 was shifted from its position some 200 feet from well #1 and anchored about 600 feet from the well. The Court below found that the means and time were present to have moved the MM-71 much farther away from the well than 600 feet. The H. A. LINDSAY, a much larger vessel than MM-71, was moved at least a mile away from well #1 on Thursday.

From Thursday until Saturday, July 25, the three vessels were standing by, waiting for weather conditions to clear so work could be resumed. The hurricane season was on, and the testimony indicated Hurricane Debra passed some 150 miles from Block 86 during this time. Seas were high the whole time. On Saturday a squall struck and the winds rose to an intensity of forty to sixty miles per hour. When they had subsided somewhat, it was seen that the MM-71 had collided with well #1, resulting in substantial damage to the well's casing and platform.[2] The testimony showed the MM-71 dragged its four Danforth anchors, each of which weighed 6000 pounds.

With its petition for exoneration or limitation of liability, Brown & Root filed an *ad interim* stipulation, setting the value of the MM-71 at $65,000. Zapata's answer included the contention that Brown & Root was not entitled to proceed under the limitation statutes, 46 U.S.C. §§ 183–189, unless it surrendered the H. A. LINDSAY and the PAN-AMERICA as well as the MM-71.

On the basis of the facts set out above, the Court below concluded that Brown & Root should have moved the MM-71 much farther away from well #1 than 600 feet, and that failure to do so was

1. It developed in the trial that Brown & Root Marine Operators, Inc., had been dissolved and replaced by Brown & Root, Inc., since this proceeding was begun. Apparently the dissolution is irrelevant to determination of the rights here involved.

2. Although the extent of damages was not an issue in this trial, Zapata claims $405,-326.77 for repair expenditures and $43,-000.00 for lost production from its gas well.

negligence which was a proximate cause of the collision. The Court found the Brown & Root servants were amply warned by the weather reports they received of the danger in leaving the MM-71 where they did. It also concluded that Brown & Root failed to carry the burden of proving unavoidable accident; that the three Brown & Root vessels were unseaworthy; that all three vessels contributed in some degree to the collision; and that all three vessels must be surrendered or stipulations filed for their value.

At the outset we must define the scope of our review on this appeal. Brown & Root contends the " * * * evidence is undisputed and uncontroverted * * * save as to the conclusions which may be drawn from the evidence equally as well by this Court as by the Trial Court." Brown & Root offered lengthy testimony, and Zapata engaged in searching cross-examination of Brown & Root witnesses, some of which was rewarded with important admissions. Zapata confined its affirmative proof to introducing interrogatories and depositions. Nevertheless, the proof cannot be termed undisputed. For instance, a Mr. Mosby, the only representative of Brown & Root at the offshore operation, testified in his deposition that he had told Brown & Root's Mr. Moore and others that the well platform was in danger from the swinging of the MM-71, and asked them to move the barge, but was refused. Mr. Moore testified he recalled no such conversation. Under these circumstances demeanor is relevant on the issue of credibility. The rule of Goldberg v. P. & L. Equip. Co., 5 Cir. 1962, 311 F.2d 88, is not applicable. On issues of fact, we are bound by the clearly erroneous rule of McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954).

The Court below divided the case into the questions of (1) the existence of liability; and (2) what vessels should be included in the limitation of liability. Brown & Root raises three specifications of error, but we shall discuss them under two headings.

(1)

The Court below did not err in finding Brown & Root negligent. When a moving vessel collides with an anchored vessel or a fixed object, there is a presumption the moving vessel is at fault. The Oregon, 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943, 949 (1895); The Clarita, 90 U.S. (23 Wall.) 1, 13, 23 L.Ed. 146, 150 (1874); Patterson Oil Terminals, Inc. v. The Port Covington, 3 Cir., 1953, 205 F.2d 694, 696; The Victor, 5 Cir., 1946, 153 F.2d 200, 202, 203. The presumption suffices to make a prima facie case of negligence against the moving vessel. The Victor, supra at 202. Brown & Root relied on the defense of unavoidable accident. The burden is heavily upon the vessel asserting such a defense. "Such vessels 'must exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required.'" Boudoin v. J. Ray McDermott & Co., 5 Cir., 1960, 281 F.2d 81, 88 (quoting L. Hand, J., in The Hylas, 1925 A.M.C. 921, 925).

The Court below was supported by substantial evidence in his conclusion the Brown & Root employees at the offshore site did not do all they could reasonably have been required to do to avoid the accident. He found the radio weather reports gave ample warning of the danger in leaving the MM-71 so close to the well, when it could have been moved farther. We note that Mr. Moore, Brown & Root's engineer, testified the MM-71 could have been moved by kedging its anchors on Saturday morning, before the squall struck.

(2)

The Court below did not specifically state whether he applied the limitation statute or not. His decree ordered the surrender of all three vessels present at the time of the collision. We read the decree to hold that all three vessels constitute "such vessel" within the mean-

ing of 46 U.S.C. § 183(a).[3] See Standard Dredging Co. v. Kristiansen, 2 Cir., 1933, 67 F.2d 548, 551 (per L. Hand, J.).

"When the 'offending' vessel in whose behalf limitation is claimed is not one vessel but a flotilla (for example, a tug and her tows), the question is raised whether the whole flotilla must be surrendered or only the particular vessel which was most immediately involved in the collision." Gilmore & Black, The Law of Admiralty 716, fn. 132 (1957).

■ Two vessels made fast to one another to perform a single contract of carriage, of course, constitute a flotilla for purposes of limitation of liability. The Columbia, 9 Cir., 1896, 73 F. 226, 237, cert. denied sub nom. Oregon R.R. & Nav. Co. v. Balfour, 176 U.S. 685, 20 S.Ct. 1027, 44 L.Ed. 639 (1900). Brown & Root argue on this appeal that the collision of the MM-71 was a "tort independent of any contract". We cannot agree with this contention.

■ Where the injury is to a third person, to whom the shipowner owes no duty based upon consent, he may limit his liability to the ship against which a maritime lien would arise from the wrong. Liverpool, Brazil & River Plate Steam Nav. Co. v. Brooklyn Eastern Dist. Terminal, 251 U.S. 48, 40 S.Ct. 66, 64 L.Ed. 130 (1919); Standard Dredging Co. v. Kristiansen, supra. However, " * * * to limit liability for breaches of duties incidental to a contract, all vessels which take part in the undertaking must be surrendered". The fact that the vessels are not physically bound together is irrelevant; the test is " * * * devotion to a single venture * * * ." Id. 67 F.2d at 550.[4]

In United States Dredging Corp. v. Krohmer, 2 Cir., 1959, 264 F.2d 339 (also written by Judge Learned Hand), the factor determining that vessels constituted a flotilla was their interdependence. A dredge depended on attending vessels for propulsion and for transportation of its crew and supplies. It was held the attending vessels were necessary to the performance of a contract in which the dredge was engaged and therefore, with the dredge, constituted a flotilla under 46 U.S.C. § 183.

■ The Court below found that the three vessels were owned by the same person, that is, by Brown & Root; that they were contractually engaged in a common enterprise; and that they were under a single command. These findings are not contested. Under these conditions we find no error in the holding below that the MM-71, the H. A. LINDSAY and the PAN-AMERICAN constituted a flotilla which must be surrendered or have its value stipulated for Section 183 limitation of liability.

In view of this holding, we deem it unnecessary to pass on the other questions considered below.

The judgment of the District Court is Affirmed.

3. § 183. Amount of liability; loss of life or bodily injury; privity imputed to owner; "seagoing vessel."

(a) The liability of the owner of any vessel * * * for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not * * * exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

4. The Court in *Kristiansen* made the following statement:

"If for example, Kristiansen [an injured seaman suing the shipowner on whose barge he had been employed] had mishandled the barge's anchor and set her adrift, so that she fouled another barge nearby, or injured someone on board, we understand that the barge alone would have to be surrendered * * *." 67 F.2d at 550.

We think it obvious the Court is referring to a situation where a third party or his barge was injured or damaged, absent any contractual relationship, as in *Liverpool*, supra.