**SULPHUR TERMINALS COMPANY, Inc.**

v.

**PELICAN MARINE CARRIERS, INC. and the SS LOUISIANA BRIMSTONE.**

**Civ. A. No. 66–45.**

United States District Court
E. D. Louisiana,
New Orleans Division.

March 1, 1968.

---

Robert M. Contois, Jr., T. A. Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for plaintiff.

J. Dwight LeBlanc, Jr., Chaffe, McCall, Phillips, Burke, Toler & Hopkins, New Orleans, La., for defendant.

MITCHELL, District Judge.

Plaintiff, Sulphur Terminals Company, Inc., brought suit against defendants, Pelican Marine Carriers, Inc. and the S/S Louisiana Brimstone, for damages allegedly sustained when the Louisiana Brimstone damaged a piling cluster and wharf walkway owned by plaintiff. The Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### I

Plaintiff, Sulphur Terminals Company, Inc., is the owner of a docking facility at Hooker's Point, Tampa, Florida, which is especially designed and constructed for the handling of cargoes of molten sulphur.

### II

Plaintiff's docking facility is T-shaped with a walkway extending south or downstream along the same line as the cross portion of the "T", i. e., the walkway is parallel to the bank.

### III

At the time of the incident out of which this suit arose, two cylindrical concrete cells and three piling clusters were spaced along the outside of the dock and walkway. One concrete cell was placed at the upstream (north) end of the dock and the other was placed approximately in the center of a line formed by the cross portion of the "T" and the walkway extension. Two of the piling clusters were placed farther downstream from the cell in the center of the structure, one at the southernmost end of the walkway and the other about midway between it and the southerly concrete cell.

### IV

The piling cluster which plaintiff claims was damaged was the one at the downstream (south) end of the walkway. It consisted of 27 individual pilings which were some 65 feet long.

### V

The cluster had been placed in December, 1960, or January, 1961. Individual holes ten feet deep were drilled in the coral rock which formed the bed of the channel, after which pilings were placed in the holes and driven tight. The piling

were bolted together at the top, then the cluster was wrapped with about ten wraps of one-inch cable at both the top and the waterline.

## VI

The top of the cluster projected about fourteen feet out of the water, which was about 32–33 feet deep.

## VII

The walkway was shoreward of the piling clusters with a space of 2′ to 2½′ between the shoreward edge of the clusters and the outboard edge of the walkway. The walkway was supported by piling and was not attached directly to the clusters. The space between the cluster in question and the walkway was bridged by a short metal ramp which sat on top of both the cluster and the walkway.

## VIII

Defendant *in rem*, The S/S Louisiana Brimstone, is a tank vessel, official number 247757, of 13,118 gross tons and 8885 net tons, 612 feet in length, with a beam of 80 feet.

## IX

The Louisiana Brimstone is in regular service carrying molten sulphur from the Freeport Sulphur Company dock at Port Sulphur, Louisiana, to the Sulphur Terminals Company, Inc., dock in Tampa. Occasionally, she carries cargo to East Coast ports.

## X

The Louisiana Brimstone was first placed in service in March, 1965, about five months before the incident in question.

## XI

At all times pertinent hereto, defendant, Pelican Marine Carriers, Inc., was the managing agent and operator of the Louisiana Brimstone.

## XII

On July 25, 1965, the Louisiana Brimstone completed a voyage from Port Sulphur to Tampa to discharge a cargo of approximately 21,000–22,000 tons of molten sulphur.

## XIII

As she entered Tampa Harbor, she took aboard Tampa Bay Pilot Captain Walter N. Egan and was assisted through the harbor by the Tugs Tampa and Orange. She proceeded up the channel on which the docking facility is situated to a turning basin where she was turned around and headed downstream to dock. Thereafter, both tugs were made up to her starboard side, the Orange on her bow and the Tampa on her stern. She proceeded downstream (south) to the area of the docking facility and, with the assistance of the tugs, began maneuvering to tie up to the Sulphur Terminals dock. This was shortly before noon.

## XIV

As the Louisiana Brimstone was being moved toward the dock, A. C. Griffin, an employee of Sulphur Terminals Company, Inc., was standing at the end of the walkway, just opposite the southernmost piling cluster, in order to take a line from her to secure to the piling cluster.

## XV

The terminal superintendent, J. B. McMaster, was standing on the dock near the piling cluster which was next upstream, some fifty feet away, from the one by which Griffin was standing.

## XVI

As the Louisiana Brimstone moved into the dock, both Griffin and McMaster noticed that she was on a slight angle with her bow further inshore than her stern. Her port bow came into contact with the southernmost piling cluster at a point some 30′ to 40′ aft of her stem. Her bow continued to move shoreward, pushing the piling cluster into the walkway and shoreward some four to six feet.

## XVII

Both Griffin and McMaster heard loud popping and cracking noises as the piling cluster was shoved shoreward. When he

realized that the piling cluster was going to be pushed into the walkway, Griffin ran back up the walkway toward Mc-Master.

## XVIII

After the cluster had been pushed out of position some four or more feet, the vessel's bow disengaged contact with, and moved slightly away from, the cluster. Although it returned partway to its original position, the cluster did not regain a vertical position.

## XIX

McMaster went aboard the Louisiana Brimstone immediately after the accident and informed her master, Captain Elmore F. Maxwell, that she had damaged the dock. No entry was made of the incident in the Louisiana Brimstone's log, and none of her crew could remember conducting any investigation of the accident. Specifically, Captain Maxwell could not recall if he had questioned the chief mate, who had been on the forecastle head, or any other members of the crew, who had been on the ship's bow to handle lines in docking. In addition, Captain Maxwell did not recall going, or sending anyone, to examine the dock at the point where McMaster had stated it was damaged.

## XX

The Louisiana Brimstone's fore and aft spring lines were secured to the damaged cluster. Her bow extended some 200′–250′ further downstream from the damaged pile cluster, and her bow lines were secured to a separate small dock which came out from the shore at a point approximately opposite her stem.

## XXI

The proper procedure for berthing the Louisiana Brimstone at the Sulphur Terminals Company dock was to bring her into a position parallel to and slightly off, the dock, and then to use the tugs, one on her starboard bow and the other on her starboard stern, to breast her to port until she made contact with the dock. According to Captain Maxwell, initial contact between the ship and the dock, under normal and proper circumstances, would occur when the ship's port side came in contact with the concrete cell in the center of the dock.

## XXII

The fact that in a normal landing contact was against the center cell was dictated by two factors. First, the outer edge of the concrete cells were some 2′ to 3′ further out into the channel than the outer edge of the pile clusters. Second, the contour of the side of the Louisiana Brimstone was such that, if she were breasted in with her center line nearly parallel to the line of the dock, her widest portion would be about amidships and, naturally, would reach the dock first. After breasting her against the dock, under proper and normal circumstances, she would be moved forward (downstream) from 50′ to 75′ in achieving her final moored position. There, she would rest with only one bearing point (point of established contact) against the dock. That bearing point would be at the concrete cell in the center of the dock and her stability against this bearing point was maintained by taking sufficient tension on the bow and stern lines to balance her on the cell.

## XXIII

The piling cluster which was damaged in the accident was not used as a bearing point by the ship.

## XXIV

Captain Maxwell testified, and the Court recognizes as a fact that, in maneuvering a ship in its docking procedure, it is customary for the ship to lie against the various cells and clusters on the outside edge of the dock and exert some pressure on them. This laying against is intentional, and the dock should have sufficient strength to withstand the pressure.

## XXV

The Court cannot accept as a fact the defendants' contention that any contact with the cluster was simply a matter of

the vessel's laying against it in the normal docking procedure. According to defendants' own experts, Captain Maxwell and Captain William T. Corfield, at no time should contact be established between this particular cluster and the bow of the vessel at a point approximately 30 feet back of her stem. This point on the vessel is over 150 feet forward of the spot on her skin which would be opposite that cluster in her final moored position. Captain Maxwell testified that after landing the vessel against the dock, it might be moved forward 50′ to 75′, but it would not be moved forward as much as 150′. The Court concludes that the contact which did the damage to the cluster was neither a landing contact nor a laying against in a normal docking procedure. Rather, it was an unintentional striking or collision between the vessel and the dock.

### XXVI

The Court concludes further that the physical evidence establishes that the vessel did in fact come in at an angle off the proper line of approach. The bow would have to be angled toward the shore for it to strike the cluster some 30 feet back of the stem on the port side instead of landing against the concrete cell in the center of the dock.

### XXVII

Following the accident, plaintiff sought bids from two contractors in the Tampa area for replacement of the piling cluster. One, in amount of $11,400, was received from Norman Chastain Construction Company on August 3, 1965. Mr. I. Norman Chastain, president of the company, had been superintendent of Tidewater Construction Company at the time Tidewater had initially constructed the clusters. The second, by letter dated August 3, 1965, for $11,050 was received from Hardaway Contracting Company.

### XXVIII

At the time of the accident, plaintiff had prepared plans to improve the dock facility by extending the walkway approximately 30 feet in a southerly direction and adding a third concrete cell at the end of the extension. The purpose of the additional cell was to provide a second bearing point for the Louisiana Brimstone, to improve her stability at the dock.

### XXIX

In view of the fact that the added concrete cell would also be able to perform the function previously performed by the damaged cluster, i. e., hold the ship's spring lines, plaintiff elected to remove the damaged cluster rather than replace it. The removal was accomplished as soon as the construction of the new concrete cell was completed in late December, 1965.

### XXX

Between the time of the accident and completion of the new cell, plaintiff continued to use the piling cluster since it was the only place available on which to secure the spring lines of the Louisiana Brimstone. The cluster had been substantially weakened, however, and, had not the new concrete cell already been planned, it undoubtedly would have been necessary for the cluster to be replaced. The popping and cracking noises which were heard by both Clark and McMaster were convincing evidence of cracking and/or breaking, and it would have been impossible to determine the condition of the individual pilings in the cluster without removing the cable wrappings and bolts which held it together and pulling the pilings out of their footings. In other words, it would be necessary to remove the cluster completely in order to accurately determine how much damage had been caused as a result of the incident.

### XXXI

The Court cannot accept defendants' contention that the addition of the new concrete cell rendered the piling cluster absolutely valueless. Had the cluster not been damaged so as to require its removal, it would have been available as a point to which additional lines from the vessel could have been tied in event

of heavy weather. In addition, defendants' expert surveyor and marine engineer, Mr. Stanley LeCourt, testified that the cluster would be of value in securing vessels smaller than the Louisiana Brimstone.

### XXXII

The piling cluster had a life expectancy of approximately 15 years. At the time of the accident, it was almost five years old. The measure of damages suffered by plaintiff should be reduced accordingly by a factor of $33\frac{1}{3}\%$ for depreciation. Accepting the lower bid by Hardaway Contracting Company of $11,050, and applying the depreciation factor, plaintiff's damages amount to $7,367.

### XXXIII

In addition to the damages for destruction of the cluster, plaintiff expended $780 for repairs to the damaged walkway and $750 to remove the pile clusters.

### CONCLUSIONS OF LAW

#### I

This Court has jurisdiction over this claim under the Admiralty Extension Act.[1]

#### II

When a moving vessel strikes a stationary object, such as a dock, an inference of negligence arises and the vessel must bear the burden of rebutting that inference. The inference or presumption does more than require the vessel to go forward and produce some evidence on the matter. The vessel must show that it was without fault or that the collision was caused by the fault of the stationary object.[2]

On the facts established at the trial, defendants failed to discharge the burden placed upon them. The only evidence which they offered was testimony of the master, the pilot, and various members of the vessel's crew to the effect that they did not remember anything particular about the docking itself and, therefore, concluded that it had been a normal one. In the absence of any evidence to the contrary, the negligence of the Louisiana Brimstone is established.

#### III

Plaintiff is entitled to damages for the destruction of its piling cluster and damages to its walkway in the amount of $8,897. Plaintiff's right to recovery is not altered by the fact that the cluster was not replaced.[3]

Let judgment be entered accordingly.

---

1. 62 Stat. 496, 46 U.S.C. § 740 (1948).

2. Carr v. Hermosa Amusement Corp., 137 F.2d 983 (CA 9–1943); Patterson Terminals, Inc. v. S/S Johannes Frans, 209 F.Supp. 705 (ED Pa.–1962). Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co., 377 F.2d 724 (CA 5–1967).

3. Theothilatos v. Martin Marine Transp. Co., 127 F.2d 1016 (CA 4–1942); Streckfus Steamboat Line v. United States, 27 F.2d 251 (CA 5–1928). See also the Zeller No. 12, 68 F.Supp. 795 (SD NY–1946), aff'd, 166 F.2d 32 (1947); The Nonpareil, 12 F.Supp. 106 (SD NY–1935).