**CHEVRON OIL COMPANY**

v.

**The M/V NEW YORKER, her engines, tackle, apparel, furniture, etc., in rem and Seal-Land Service, Inc., in personam.**

**Civ. A. No. 68–884.**

United States District Court
E. D. Louisiana,
New Orleans Division.
March 20, 1969.

Rufus C. Harris, Jr., Terriberry, Rault, Carroll, Yancey & Farrell, New Orleans, La., for plaintiff.

Harry S. Redmon, Jr., T. A., Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for defendant.

MITCHELL, District Judge.

This cause involves a collision between the M/V New Yorker and a stationary gas well structure in the Gulf of Mexico off the coast of Louisiana. Chevron Oil Company, owner of the well, filed libel against the M/V New Yorker, in rem, and her owner, Sea-Land Service, Inc., and the latter filed cross-claim against Chevron. The Court makes the following findings of fact and conclusions of law.

### I

On December 28, 1967, Chevron was the owner of a gas well, designated S.L. 1262–#4, located in 50 feet of water at latitude 29° 57′ 2.7″ west in the Main Pass Area, Block 41 Field, in the Gulf of Mexico about 25 miles east of Venice, Louisiana. An unmanned, fixed platform was built atop the well's mud line, its black tubular steel upper structure rising 54′ above mean low water, with a horizontal width ranging from 15′ at water level to 5′ at the top.

### II

Drilling of the well was undertaken in 1961, pursuant to a blanket permit issued to Chevron by the United States Corps of Engineers. After completing the well and platform, Chevron made application to the United States Coast Guard for permission to install a Class 1 Private Aid to Navigation, to mark the obstruction to navigation. The application was approved by the Commandant, 8th Coast Guard District, New Orleans, and Headquarters, United States Coast Guard, Washington, D. C., requiring that the platform be equipped with a white, electric, 200 candle power, 12 volt, 1.15 amp., 200 millimeter, 360° lens light, placed 51′ above the water, flashing at intervals of 0.3 seconds, with an 0.7 second eclipse, and a horn with a 2 second blast and 18 second silent sound characteristic, audible for two miles, which signals were to be discernible continuously. On June 10, 1964, an amendment to the permit was granted, whereby the light's candle power was reduced to 195 and the height of the light above water level was raised to 54 feet.

On the night of December 28, 1967, Chevron was required by the terms and conditions of its application and by statutory sanction to have the platform equipped with an operating light and horn of the aforementioned characteristics.

### III

Chevron's platform 1262–#4 was a satellite structure, located about one mile northeast of the parent structure, which latter was designated as B Structure. In the area immediately adjacent to and surrounding B Structure were four other Chevron satellite platforms: 1262–#5, 1373–#4, 1262–#3 and 1263–#5, each of which was required by statute to

be equipped with operating lights and horns of the same type as those for platform 1262–#4.

## IV

As may be seen from the chart of the area,[1] platform 1262–#4 is located ad-

1. Exhibit 1.

EXHIBIT 1

jacent to the Safety Fairway at a point where the Fairway makes a 90° turn due west.

## V

The New Yorker is a container ship, built in 1960, with registered dimensions of 349.7' length, 52.1' breadth, of 4684 gross, and 3371 net, tons with two engines developing a total of 4200 hp. On December 28, 1967, she was enroute from Houston, Texas, to New Orleans, Louisiana, making a speed of about 15 knots.

## VI

The New Yorker picked up her pilot at 1825 hours and at 2000 hours the pilot proceeded to the bridge to take over the conn. He found the master, the third officer and the helmsman on the bridge. The ship's lookout was on the bow; the night was dark and clear; and visibility was unimpaired. The ship was being navigated by visual aids and, although radar was available, it was not used by the pilot.

## VII

The pilot assumed the conn at about 2020 hours as the vessel was preparing to enter the Gulf Outlet Channel.

## VIII

The watch officer testified that when the pilot took the conn, he said, "Let's take a short cut".

## IX

Subsequently, the vessel remained under the conn of the pilot and her position was determined by visual observation. The master, third officer, helmsman remained in the pilothouse and the lookout remained at his post.

## X

At about 2024 hours the lookout reported to the bridge that he heard a horn off the port bow and, during the conversation, the third officer instructed him to release the devil's claw on the anchors. The testimony is in conflict as to whether or not this was done prior to the collision but it would seem more credible that the lookout released the devil's claw before the collision, inasmuch as he failed to see Chevron's platform in time to avoid a collision.

## XI

At about 2026 the lookout saw the loom of a dark, unlighted object dead ahead. He telephoned the bridge; reported the sighting to the third officer; and, almost simultaneously, the third officer, pilot, and master saw the loom of an unlighted object, which looked like scaffolding. Although the pilot ordered the helmsman to go hard right, within seconds the New Yorker's stem was in collision with the object.

## XII

At the time of the collision, the New Yorker was some .5 to .7 miles west of the position estimated by her pilot, and about 200 feet out of the Safety Fairway.

## XIII

After the collision, the vessel circled from 2026 to 2100 hours, looking for debris, but nothing was found. The pilot reported the incident to the Coast Guard and called Chevron, which he knew had a crewboat in the field. The following morning, Chevron discovered that its platform 1262-#4 had been destroyed.

## XIV

The Court finds that the evidence supports the testimony of the respondent's witnesses that, at the time of the collision, the light and horn of platform 1262-#4 were inoperative and that, had these navigational aids been in working condition, the collision would have been avoided.

## XV

Finally, the Court finds that if the pilot of the New Yorker had used radar; had he not taken a short cut; had he relied upon the sea buoy, Mr. Go; and had he not ordered the lookout to release the devil's claw, the collision would have been avoided.

**416**

## CONCLUSIONS OF LAW

### I

This Court has jurisdiction of this action as an admiralty and maritime claim, and venue is properly laid in the Eastern District of Louisiana.

### II

 When a moving vessel collides with a stationary or fixed object, there is a presumption of fault and the vessel must bear the burden of rebutting that inference.[2] The vessel must show that it was without fault or that the collision was caused by the fault of the stationary object or that it was the result of an inevitable accident.

### III

 The New Yorker has failed to bear this burden of proof. The evidence establishes that she was at fault in failing to maintain a proper lookout and in failing to use her radar and other navigation aids when taking a short cut through hazardous waterways:

### IV

Having constructed a platform in navigable waters, Chevron was under a duty to install and maintain certain private aids to navigation, including a horn and a light.[3]

### V

Since at the time of the collision the light and horn on drilling platform 1262–#4 were not operating, Chevron was in violation of the aid to navigation statutes and regulations issued thereunder.

### VI

 The commission of a statutory fault imposes upon the offender the burden of showing not merely that her fault might not have been one of causes, or that it probably was not one of them, but that it could not have been.[4]

### VII

Chevron has failed to meet the burden of proof imposed by the rule of the Pennsylvania. If the light on platform 1262–#4 had been burning prior to the collision, the collision could, and probably would, have been averted.

### VIII

The collision resulted from the equal and mutual fault of Chevron and the New Yorker.

### IX

Decree accordingly.

---

2. The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1895) ; The Louisiana, 3 Wall. 164, 70 U.S. 164, 18 L.Ed. 85 (1866); Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co., 377 F.2d 724 (CA 5–1967) ; Sulphur Terminals Co. v. Pelican Marine Carriers, Inc., 281 F.Supp. 570 (ED La.–1968).

3. 33 C.F.R., Sec. 66.01–35.

4. The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1874).