**FREEPORT SULPHUR COMPANY,**
Plaintiff,

v.

**The S/S HERMOSA, her engines, tackle, apparel, furniture, etc., in rem and PANSUIZA COMPANIA de NAVIGACION S.A. in personam, Defendants.**

Civ. A. No. 71–798.

United States District Court,
E. D. Louisiana.

Nov. 20, 1973.

John W. Sims, James B. Kemp, Jr., Richmond Eustis, New Orleans, La., for plaintiff.

Walter Carroll, Jr., New Orleans, La., for defendants.

ALVIN B. RUBIN, District Judge:

OPINION

This is a simple case of a ship that hit and damaged a wharf. No explanation for the impact is offered. Liability for the resultant damage is therefore clear.

Freeport Sulphur Company (Freeport), was the owner of a sulphur loading and unloading facility, ("the dock"), located on the west, or right descending bank, of the Mississippi River at Port Sulphur, Louisiana. During the night of March 21, 1971, while the S.S. HERMOSA was attempting to moor at the dock, it collided with the upstream end of the dock and the driftwood deflector located at its upstream end. Both the dock and the driftwood deflector were damaged as a result of the collision.

The dock was properly lit at all times. The S.S. HERMOSA, under the control of a compulsory State River Pilot, and its officers and crew, was proceeding downriver from New Orleans. It approached the dock by rounding to and heading upstream. There were no tugs assisting the vessel, and apparently the pilot intended to move the HERMOSA broadside into the dock. Instead, for no reason that the defendant has seen fit to offer, save as a result of what must be assumed to be faulty navigation, the HERMOSA hit the driftwood deflector, and then rolled back against the dock at its extreme upstream end.

The driftwood deflector and the extreme upstream end of the dock were not designed for the berthing of ships, but to act as deflectors. Ships never berthed there and none were expected to do so. The dock was properly constructed in accordance with permits for its construction granted by the Army Corps of Engineers; the District Engineer, United States Army Engineer District; Louisiana State Department of Public Works, and the Plaquemines Parish Police Jury, and was properly designed. There was no prior or pre-existing damage to the dock on March 21, 1971, and the collision occasioned major damage.

Defendants argue that the impact was too slight to have occasioned the damage had the dock been properly built, but the evidence satisfies me that the dock was suitably built and the impact was the cause of the damage. That the ship itself was not damaged means little. The ship's captain testified, by way of deposition, that the ship had no damage, and he was therefore astonished at seeing the damage to the dock. He thought the damage was due to some other event or else that the dock was rotten. These conclusions are self contradictory. In addition they are contrary to the other evidence heard at the trial. I consider that evidence credible and conclude that the dock was in good condition, and that it did in fact sustain the damage complained of as a result of the impact.

It is well established that there is a presumption of fault against a moving vessel that strikes a stationary object, such as a dock or navigational aid. Brown & Root Marine Operators, Inc. v. Zapata Offshore Co., 5 Cir. 1967, 377 F. 2d 724; Chevron Oil Co. v. M/V New Yorker, E.D.La.1969, 297 F.Supp. 412; Sulphur Terminals Co., Inc. v. Pelican Marine Carriers, E.D.La.1968, 281 F. Supp. 570.

An inference of negligence arises from such a collision and the vessel must bear the burden of rebutting that inference. In order to rebut this inference of negligence, the vessel must show that it was without fault or that the collision was caused by the fault of the stationary object or that it was the result of an inevitable accident. Brown & Root, supra; Chevron, supra; and Sulphur Terminals, supra. There has been no showing of any of these exculpatory defenses. The vessel's negligence is further demonstrated by the fact that

other vessels have safely navigated the same waterway under like conditions.

The damages suffered by Freeport have been proved as follows:

1. Inspection of damage to dock and driftwood deflector:

| | | |
|---|---|---|
| a) Inspection and report of under-water damage by Pelican Marine Divers, Inc. | $ 489.54 | |
| b) Engineering inspection of above-water damage, 16 hours at $17.90 per hr. | 286.40 | |
| c) Travel expense | 56.99 | |
| TOTAL FOR INSPECTION OF DAMAGE | | $ 832.93 |

2. Plans and specifications for repair work:

| | | |
|---|---|---|
| a) Engineering design of replacement structure and preparation of specifications, 236 hours at $17.90 per hr. | $4,222.72 | |
| b) Preparation of drawings for replacement structures, 127 hours at $13.93 per hr. | 1,824.01 | |
| TOTAL FOR PLANS AND SPECIFICATIONS | | $6,046.73 |

3. Reconstruction of damaged dock and driftwood deflector:

| | | |
|---|---|---|
| a) Contract with Boh Bros. Construction Co., Inc. for structural repairs—$65,350.00 | $65,350.00 | |
| b) Repair work by Freeport maintenance shop to salvage and replace existing lights, power cables, cathodic protection system and fire protection system on damaged dock, $1,450.00 | 1,450.00 | |
| c) Disposal of damaged dock material by Freeport: | | |
| Freeport towboat 878.86 | | |
| Freeport labor 134.40 | | |
| Contract labor 182.00 | 1,195.26 | |
| d) Freeport engineering inspection and supervision of construction in progress, 377 hours at $13.93 per hr. | 5,250.30 | |
| e) Freeport's services in providing alignment and grade for reconstruction, 244 hours at $14.25 per hr. | 3,476.24 | |
| f) Travel expense, Freeport engineering | 539.74 | |
| TOTAL FOR RECONSTRUCTION OF DAMAGED DOCK | | $77,261.54 |
| GRAND TOTAL | | $84,141.20 |

The repairs were let to the lowest bidder, Boh Bros. Construction Co.

While the defendant challenges Freeport's internal expenses (items 1c, 2a, 2b, 3c, 3d, 3e, and 3f above), the evidence indicates that this work was in fact done as a result of the collision. The hourly amounts on which the calculation is based are reasonable. The only evidence to the contrary was by a consulting engineer, called as a witness by the defendant, who said he found the total overhead "high" but who further testified his own firm would not undertake such work for a fixed fee or a percentage of cost, but only on an hourly basis. The evidence indicates that hourly records were properly kept. Freeport's services included some work that might normally be done by the contractor. All in all, I find its records accurate and its charges reasonable.

■ The damages properly include the engineering costs that were incurred by Freeport for work by its own engineers in aiding, inspecting and supervising the repairs. Baltimore and Ohio R. Co. v. Commercial Transport, Inc., 7 Cir. 1960, 273 F.2d 447; Crain Brothers, Inc. v. Duquesne Slag Products Company, 8 Cir. 1959, 273 F.2d 948; Starved Rock Scenic Boat Co. v. M/V LA SALLE, Arb., N.D.Ill.1961, 1961 A.M.C. 662. The evidence satisfies me that these expenses were actually incurred. Freeport undertook the work. Had it resulted in a net saving, the benefit would have inured to the defendant. The cost does include some supervision work required of Freeport that would not have been required even had engineering been contracted out.

The remaining issue pertaining to damages is whether the cost should be reduced for depreciation. The usual dicta concerning depreciation say something like the following:

". . . recovery must be reduced in proportion to prior depreciation of the repaired portions of the structure, stipulated to be 40%, such depreciation allowance to apply to the entire cost of repairs, without distinction between cost of materials and cost of labor." Oakdene Compress & Warehouse Co. v. S/S Cities Service Norfolk, E.D.S.C.1965, 242 F.Supp. 148, 151."

See also Allied Chemical Corporation v. Edmundson Towing Company, E.D. La.1970, 320 F.Supp. 448; Seaboard Air Line R. Co. v. Marine Industries, Inc., E.D.S.C.1964, 237 F.Supp. 10; Brooklyn Water Term. Corp. v. International Term. Op. Co., S.D.N.Y.1962, 211 F. Supp. 702.

But this simple statement of the rule is misleading. The real issue is not whether the repaired item had depreciated before the collision but whether the repairs resulted in an extended useful life. Let us take a simple example: suppose one part of the wharf decking was damaged on a wharf that had been in use 15 years, ½ its useful life; it is shown that replacement of the damaged part will not extend the life of the new wharf as a whole; and when the wharf is rebuilt the "new" decking must be replaced with the rest. Under such circumstances the owner should recover the full cost of repairs.

An accurate statement of the applicable rule is found in Canal Barge Co., Inc. v. M. K. Griffith, 5 Cir., 480 F.2d 11, decided only a few weeks ago by the Fifth Circuit Court of Appeals:

> "A party suffering injury to his property is entitled to no more than restoration to its condition prior to the wrong. See, e. g., The Baltimore, 75 U.S. (8 Wall.) 377, 19 L.Ed. 463 (1869); Tug June S v. Bordagain Shipping Co., 418 F.2d 306 (5th Cir. 1969); T. H. Browning Steamship Co. v. F. H. Peavey & Co., 235 F.2d [5], [8] (8th Cir. 1956). As a practical matter, repair may leave property in a better condition. Depreciation, which in terms of a declining dollar figure reflects the annual depletion of an item's continuing usefulness for a given purpose, then becomes a handy tool to reduce the recovery for repair costs to the level necessary to return the injured party to the economic position in which he was found."

■ The question then is what amount of damages will return the plaintiff to the economic position it was in before the collision. This entails inquiry into whether the value of the dock has been enhanced beyond its pre-collision value, or whether its life has been extended. See *Canal Barge, supra*; State of Oregon v. Tug Go-Getter, 9 Cir. 1972, 468 F.2d 1270; J. V. Paxson v. Board of Chosen Freeholders, D.N.J., 1912, 3 Cir.

1912, 196 Fed. 156, aff'd 211 Fed. 656; Hinfin Realty Corporation v. M/V POLING BROS., No. 7, E.D.N.Y.1972, 348 F. Supp. 1391. Depreciation is a factor to be considered, but neither the accounting concept of depreciation, nor the prior life of the facility is itself dispositive. Remaining life is affected by many other facts, including the type of prior use, maintenance and repair expenditures during prior use, and other factors that would affect remaining useful life.

■ The dock was 16 years old, but had received excellent maintenance. It had been inspected only a few months before the casualty and had been found to be in good condition, and to require only minor repairs. Defendant's expert placed the remaining useful life of the original structure as it was at the time of the casualty at 10–12 years. He estimated the useful life of the reconstructed facility as 25 years. This results in an extension of useful life amounting to 13 to 15 years. The expert evidence offered by Freeport taken as a whole, supports the conclusion that, as a result of the reconstruction, the useful life of the reconstructed facilities was extended 10 years. The evidence also indicates that the remaining useful life for the original dock, properly maintained, would have been at least 25 years. Applying 10 to this base yields a fraction of $^{10}\!/_{25}$ or 40%. That is the percentage of useful life extension.

■ To the extent that depreciation is allowed against the amount of damages, the owner must expend funds for replacement and repair of the dock long before it would have been required to do so in the normal course of business. To reimburse it for capital before it would normally be required to divert funds from operation, it should be allowed interest on the amounts so expended for the remainder of the useful life of the original dock.

■ The prime rate of interest now is in excess of 9% and the legal rate in Louisiana is 7%. The present value at 7% discount of $1 payable 25 years

hence is $0.18. Therefore the 40% reduction in the damages allowable for extended life should be itself reduced by 82%. This results in a net reduction of 7.2% [40% minus 32.80%]. The evidence also indicates that the dock needed $200 in repairs in 1971. That sum also should be deducted. Interest on the judgment will be allowed at the rate of 7% per annum from January 1, 1972, the approximate date of payment to the contractor, though considerable expense was incurred prior thereto.

Accordingly there will be judgment in favor of plaintiff and against defendant in the sum of $84,141.20, reduced by 7.2% and by the additional sum of $200, making the net sum $77,883.03, with interest at the rate of 7% per annum from January 1, 1972.