**GEORGIA PORTS AUTHORITY,**
**Plaintiff,**

v.

**L/S BILDERDYK, her engine, tackle, etc., Hapag-Lloyd Ag and Holland America Line, d/b/a Combi Line, owners of the L/S BILDERDYK, Atlantic Towing Company, a corporation, owners and operators of the TUG LAWTON M. CALHOUN and the TUG SAVANNAH, their engines, tackles, etc., Defendants.**

**Civ. A. No. 3203.**

United States District Court,
S. D. Georgia,
Savannah Division.

Oct. 15, 1975.

Fred S. Clark, Lee & Clark, Savannah, Ga., for plaintiff.

Ralph O. Bowden, III, Hunter, Houlihan, Maclean, Exley, Dunn & Connerat, Savannah, Ga., for the Bilderdyk and Owners.

Julian C. Sipple, Savannah, Ga., for Atlantic Towing Co.

## OPINION AND ORDER

LAWRENCE, Chief Judge.

*Findings of Fact and Conclusions of Law*

This suit in admiralty is brought by Georgia Ports Authority to recover damages to its LASH mooring facility located near the mouth of the Savannah River as a result of alleged negligence in the docking of the vessel "Bilderdyk" on May 27, 1973.[1]

Plaintiff claims that the collision (allision is the technical term) caused damage to a dolphin amounting to $121,970. There are cross-claims between the defendant COMBI LINE (a trade combination that operated the "Bilderdyk") and Atlantic Towing Company which owns the tugs "Savannah" and "Lawton M. Calhoun". They assisted the vessel in mooring.

The case was tried before this Court without a jury on July 10–11 and 14, 1975.

The evidence must be viewed in the light of the rule of presumptive fault when a moving vessel strikes a fixed object. A *prima facie* case of negligence by the ship is created as the result of such a collision and the burden of disproof is cast on the vessel.[2] To overcome the presumption, the vessel in motion must show that she was without fault or that the collision was occasioned by the stationary object or that it was the result of an inevitable accident.[3]

The LASH facility was completed in 1972 and is located on the north side of the channel of the Savannah River on

1. "LASH" is an acronym of Lighter-aboard-Ship. It is a refinement of what is known in water transportation as "containerization", a system which utilizes van-type containers and permits cargo to be packed at origin and moved to destinaton without repacking. The LASH system involves the use of rectangular steel containers with a cargo capacity of around 370 tons each. The container functions as a lighter or barge on reaching the water after discharge from the mother ship. The container barges are then towed to destination. Upon their return to the central mooring facility (empty or with new cargo) they are lifted by crane and re-stowed on the LASH vessel. See *Port Royal Marine Corporation v. United States*, 378 F.Supp. 345, 349 (S.D., Ga.).

2. *The Victor*, 153 F.2d 200 (5th Cir.); *Brown v. Root Marine Operators, Inc. v. Zapata Off-Shore Co.*, 377 F.2d 724 (5th Cir.); *Ernest Construction Co. v. The Tug Commodore*, 294 F.Supp. 15, 18 (S.D., Ala.); *Patterson Oil Terminals, Inc. v. The Port Covington*, 109 F.Supp. 953 (E.D., Pa.), aff'd. 205 F.2d 694 (3rd Cir.); *International Terminal Operating Co. v. Naviera Aznar, S. A.*, 198 F.Supp. 214 (S.D., N.Y.); *American Oil Company v. M/T Lacon et al.*, 1973 A.M.C. 1900; 398 F.Supp. 1181 (S.D., Ga.), aff'd. 496 F.2d 1405 (5th Cir.).

3. *The Clarita and the Clara*, 90 U.S. 1, 13, 23 Wall 1, 23 L.Ed. 146; *Carr v. Hermosa Amusement Corp.*, 137 F.2d 983, 985 (9th Cir.), cert. den. 321 U.S. 764, 64 S.Ct. 520, 88 L.Ed. 1060; *Patterson Terminals, Inc. v. S.S. Johannes Frans*, 209 F.Supp. 705, 707 (E.D., Pa.); *Sabine Towing & Trans. Co. v St. Joe Paper Co.*, 297 F.Supp. 748, 751 (N.D., Fla.); *Sulphur Terminals Co. v. Pelican Marine Carrier, Inc.*, 281 F.Supp. 570, 575 (E.D., La.); *Chevron Co. v. M/V*

Oyster Bed Island.[4] Its relation to the mouth of the River and to the surrounding area is shown in the drawing below.

The facility consists of a breasting area where the mother ship docks and a fleeting area in which barges are moored after being unloaded or before being reloaded on the LASH vessel. Four breasting dolphins constitute the docking part of the facility. Four mooring dolphins extend laterally and diagonally from the dredged basin east and west of the breasting dolphins.

Each dolphin has a concrete cap approximately 12'4" wide, 39 feet long and 5' thick, supported by 24 eighteen-inch square prestressed concrete piles with 8 vertical piles and 16 batter piles. The distance from the downstream end of breasting dolphin No. 1 to the upstream end of No. 4 is approximately 340 feet.

Protecting each breasting dolphin is a wooden fendering system with seven creosoted piles to which are bolted horizontal steel beam wales. Enclosed in a notched recess in the concrete pile caps of the dolphins is a rubber, doughnut-shaped roll 12" in diameter and 39' long. The fender system is so designed that when a vessel makes contact with the fender piles the wale presses against the

*New Yorker*, 297 F.Supp. 412, 416 (E.D., La.) ; *L & N RR v. M/V Ciudad de Turbo*, 330 F.Supp. 769, 771 (S.D., Ala.) ; *Freeport Sulphur Co. v. The S/S Hermosa*, 368 F. Supp. 952, 953 (E.D., La.).

4. COMBI was aware of the location of the mooring facility. On March 31, 1970, an official of Holland-America Line stated in a letter to GPA: "If we can receive your assurances that these facilities will be provided for and that sufficient dredging will be done at Oyster Bed Island for the mother ship to safely moor and turn around, then indeed the Holland-America Line will include Savannah as a regular port of call for their LASH ships." COMBI had also received a copy of the plan of the proposed facility.

rubber cylindrical cushion so as to transmit to same the force of the ves- sel's motion. The LASH facility on Oyster Bed Island is illustrated below.

The facility was designed to receive vessels up to 81,000 tons. The primary design criteria are the velocity and angle of approach of a ship. The facility is designed for LASH vessels approaching at a maximum velocity of 0.2 foot per second within an angle of 10° or less to the face of the dolphins. Within these design standards, no damage should theoretically result to the dock.

Oceangoing vessels calling at Savannah are met at the sea buoy off Tybee Island by a pilot boat and bar pilot. At noon on May 27, 1973, Captain Harry Padgett, Jr. boarded the "Bilderdyk" which had been held at sea awaiting the flood tide. Under Padgett's direction, the vessel proceeded into the Savannah River. James R. Strickland who is employed by Atlantic Towing Company as a docking master boarded the "Bilderdyk" along with Captain Padgett.

The distance between the downstream and upstream breasting dolphins (Nos. 1 and 4) is 340 feet. The overall length of the "Bilderdyk" is approximately 857 feet. She has a draft of 37 feet and a gross displacement of about 37,600 tons. With the cargo aboard, the total weight of the vessel was estimated at 58,000 tons. As noted above, the facility on Oyster Bed Island is designed to receive vessels of 81,000 tons at a velocity of 0.2 feet per second (12 feet per minute and .136 miles per hour) with an approach angle up to 10°.

After the "Bilderdyk" left the sea buoy area, the tugs "Calhoun" and "Savannah" came alongside her about one mile from the LASH facility. They made fast to the port side of the ship bow and stern. At 1345 the docking maneuvers began when the "Bilderdyk" was opposite the mooring facility. Meanwhile, Docking Master Strickland had taken over from the bar pilot. The tugs began to assist the movement of the vessel toward the mooring facility. It was the twentieth docking of the

"Bilderdyk" after inauguration of LASH service at Savannah in 1972.[5]

The docking procedures are dictated by the design of the facility. The dredged area adjacent to the breasting dolphins is trapezoid in shape. The side fronting the facility is 1,200 feet long. Two dredged sides of 640 feet extend at an angle and are closed in by the fourth side of 2,000 feet coinciding with the northern edge of the channel.

The "Bilderdyk" is too long to come in longitudinally to the dolphins at a slight angle due to the shape of the dredged basin. A broadside or sideways docking is necessary. The practice is to bring the LASH ship under her own power to a point opposite the facility about a ship's length distance at which time she is pushed to the dolphins by the tugs. Normally, on a flood tide the docking master backs the stern in gently, utilizing the tugs and tide to strike the dolphins flush. The ideal docking situation contemplates backing in the stern at a 30° to 40° angle until the ship is close to the dock at which time the bow is set against all of the dolphins. In reality, according to Alexander B. Stewart, General Manager of Atlantic Towing Company, ships usually strike No. 1 or No. 4 dolphin first.

At 1345 hours the "Bilderdyk" reached a point opposite the breasting dolphins. The tide was flooding. The weather was good with a light breeze blowing out of the southwest toward the facility. The tug "Savannah" was at the port bow with two bow lines and a stern line attached to the ship. The "Calhoun" was on the port quarter with bow and stern lines affixed. She was pushing the stern of the "Bilderdyk" toward the breasting dock. Docking Master Strickland was on the bridge and had "walkie-talkie" contact with the captains of the tugs who acknowledged his orders by whistle.

The prow of the vessel was 200 to 250 feet upstream from No. 4 dolphin. The stern of the "Bilderdyk" was pushed in slightly ahead of the bow. When the stern was approximately 25 feet from the dolphins, the vessel unexpectedly and momentarily stopped its motion and the bow began to swing toward the dock. The stern apparently "smelled bottom", according to Captain Strickland. The ship's engine was reversed. Orders were given to the "Savannah" to push astern on the bow. The "Calhoun" was pushing inward from the port quarter. It is agreed by practically all of the witnesses that the "Bilderdyk" was barely moving at this time.

The initial contact with the dock was made at the corner of No. 4 dolphin (the westernmost one) by the bow of the vessel at an angle of about 10°. The impact point was about 100 feet aft of the starboard wing of the bridge and 200 to 250 feet astern of the bow of the "Bilderdyk".

No one aboard the ship or the tugs was aware that considerable damage to No. 4 dolphin resulted from the contact. The Master, the Chief Officer, Third Officer and Docking Master were all surprised to learn that it occurred. No impact was felt. Captain Strickland testified that the contact was "very lightly" made, that the docking was "fairly normal", and that he had "no reason to feel" that there was any damage to the facility. He denied that the vessel was ever "out of control". This was confirmed by other witnesses. The only evidence of an impact on the side of the ship was a creosote mark. There were no scratches. The paint was not broken.

On the other hand, Gerald Wagner who was in charge of GPA testified that he was standing on No. 4 dolphin and that prior to the collision the bow of the "Bilderdyk" went upstream from No. 4 dolphin about 700 feet and later struck

---

5. Her sister ship, the "Munchen", had previously made nine dockings and undockings at the GPA facility.

same "sideways" at a speed of 4 or 5 miles per hour. Mr. Wagner testified that when he saw that the collision was inevitable he ran toward the shoreside of the facility. Countering this testimony, Edward W. Bazemore who was employed by Southeastern Maritime Company, the shipowner's Local Agent, testified that he was standing on No. 3 dolphin (with Wagner) and that the approach of the ship was as normal as in the numerous other dockings of LASH ships he had observed.

Two observations are pertinent in respect to the claim of excessive speed. According to Docking Master Strickland, it is impossible to move the "Bilderdyk" broadside at such a speed if the engine of the tug were 50,000 horsepower. The "Savannah" was 2400 h.p.; the "Calhoun" 2875 h.p. It is calculable that at 5 miles per hour the imparted kinetic energy would be 1369 times the design energy. At that speed the breasting dolphin would have been completely shattered.[6]

Plaintiff's proposed findings of fact state that the "vessel was approaching the dock at a very slow speed". I agree.

■ In *White Stack Towing Corporation v. Hewitt Oil Co.*, 216 F.2d 776, 779 (4th Cir.) the evidence was that it was "humanly impossible for a Docking Master or anyone else to make an exact four-point landing on all four dolphins." The ship will touch one dolphin first "and that gives a little and then you come along to the next one, and you gradually get alongside". The evidence in the present case followed similar lines. A wharfinger is "not entitled to expect a perfect berthing but only a nor-

mal one." *Bunge Corporation v. MV Furness Bridge, supra,* at 857.

This is especially true of the location selected for the LASH facility. It is approximately one mile from where the Savannah River becomes Tybee Roads which is part of the open sea. The advantages of the area selected include capability for a quick turn-around by the mother ship and minimum expenditure of time in discharging the LASH barges and in later reloading them. The Oyster Bed Island location presents these advantages. At the same time, the location is a rather exposed one. Twice a day the tides roil into the comparatively narrow mouth of the Savannah.[7] The River in turn empties into the Atlantic hourly an average of around a third of a billion gallons of water. Rip-tides and cross-currents result. While the facility offers a safe anchorage for LASH vessels, it is exposed to the elements. Oyster Bed Island is a marshy islet that provided little protection from the winds that blow in from the sea.

■ I am not leading up to any theory of assumption of risk by the shipowner or to any failure by the wharfinger to furnish a safe berth for the vessels. The geography of the location and the influences of the wind and tide can require a shipowner to exercise extra care because of the extra risk. At the same time, the physical phenomena militate against perfect dockings of the massive vessels. The idea of a simultaneous contact with the four breasting dolphins is not realistic. The limited area of the dredged basin rules out longitudinal approach to the facility. A crab-like maneuver is required in which the vessel, after reaching a point in the River oppo-

6. "The kinetic energy of a vessel increases proportionately with its displacement multiplied by the square of the speed. Hence the force of impact from the larger vessel becomes massively larger." *Bunge Corporation v. MV Furness Bridge*, 396 F.Supp. 852 (E.D., La.). In that case, the 965 foot vessel "nudged a mooring dolphin, causing barely perceptible damage to the vessel, leaving a score mark a few feet long. But the mas-

sive force caused an alleged $100,000 in damage to the dolphin." At pp. 855–856.

7. Flag Officer Samuel F. DuPont, U.S.N., observed at the commencement of the Union blockade of this port in 1861, "I will cork up Savannah like a bottle by placing a frigate in the roads opposite Tybee and out of range from Pulaski." *Official Records of the Rebellion, Naval*, XII, 324, 380.

site the breasting dolphins, must be pushed in to the dock by tugs.

Compared to the "Bilderdyk", the facility looks like a sea gull's skeleton. It was the first LASH installation erected in the United States. There was testimony that the plans and specifications and the construction were proper. However, more than the lack of sturdiness of the facility and its location contributed to the damage to dolphin No. 4. There was earlier reference in this Opinion to the cylindrical rubber roll which was supposed to absorb much of the force of impact with the dolphins. There is evidence as to its malfunctioning on May 27, 1973. It is contended that the wooden fender system had settled and that, as the result, the steel waler was cocked against the lower lip of the inset in the cap of the platform.[8] The force of the impact was not absorbed. It was transferred directly to the concrete portion of the dolphin. James P. Ewin, a civil engineer with considerable experience in design of waterfront facilities, deposed that "from all the information at hand, we concluded that the fender system on this No. 4 Dolphin that was so severely damaged malfunctioned and we considered that the basic cause of the damage. There were some secondary factors that contributed to that basic cause especially the lack of penetration on the fender piles  .  .  .  ." (Deposition, p. 11).

The drawings below illustrate the cushioning mechanism as designed and as it was, as the shipowner contends, at the time of the docking of the "Bilderdyk".

*Side view of breasting dolphin no. 4*

*As it was designed*                    *As it was on May 27, 1973*

The design formula as to speed and the angle of approach appear to have been based largely on contact with the face of the dolphin without adequate allowance for an off-center or eccentric impact.[9] Alonzo DeFreest Quinn, a con-

8. The shipowner says that the malfunction may be accounted for by the failure to insert a line of bolts called for in the specifications but omitted in the construction of the facili-

ty, as well as the settling of the wooden fender pilings.

9. M. F. Lang was one of the shipowner's engineering witnesses. He had designed a

sulting marine engineer, testified as an expert on behalf of the Georgia Ports Authority. He is the author of a work entitled *The Design and Construction of Ports and Marine Structures*. Mr. Quinn had prepared a report of the "Bilderdyk" incident in which he said that a vessel 1° off parallel with a velocity of 0.2 feet per second, without longitudinal movement of the ship, could result in over-stress and likely damage to the dock. He stated in the report:

> "Using the assumption of 1 degree off parallel and a velocity of 0.2 ft/sec. normal to the dolphin and no longitudinal movement of the ship upon impact I have computed the loads which would result in the piles. . . . The effect of the ship contact at the upstream corner is to increase the force against the dolphin from 390 kips (if ship's bow struck at center of dolphin) to 555.8 kips, but more important the force has an eccentricity of 12.73′ from the centerline of the dolphins, thereby causing much higher loads in the piles on the westerly half of the dolphin. Under the above conditions I find that the vertical piles in the westerly half of the dolphin will fail in uplift or the dowels into the concrete cap will pull out or break, whichever occurs first." [10]

At the time of the "Bilderdyk" incident the weather, the wind and the tide favored a normal docking. It follows, says plaintiff, that the damage to No. 4 dolphin was due to negligent handling of the vessel. It is equally arguable, however, that since the vessel's angle of approach and speed did not exceed the design criteria, the damage on impact was the result of the inadequacy and malfunction of the fendering system. If the efficiency of the rubber cushioning device was dependent on a flush contact with the dolphin face, the engineering design was unrealistic. Four-point dockings are rare.

The docking of the "Bilderdyk" was not a normal one in that the unexpected cessation of the stern movement caused corrective measures to be undertaken. Whether it was caused by "smelling the bottom" is uncertain. In any event, GPA does not contend that the cessation of the stern movement was due to negligent management. What plaintiff contends is that the ship went out of control after the stern movement ceased and the defendants negligently failed to regain control of her before the bow struck the *corner* of the dolphin. I find that the response to the emergency was adequate. The ship's engine was promptly reversed to kill her headway. Orders given by the docking master to the tug captains were responded to immediately. In fact, it is conceded by all concerned that the two tugs were not at fault. The docking was normal insofar as angulation and speed. Under the conditions that existed, a third tug was unnecessary.[11]

I find that there was an absence of negligence by the docking master, the tug captains, and the vessel. This being so, the defendants have carried the burden of disproving fault.

breasting dolphin for a LASH facility at New Orleans employing an octagonal shape with rubber fenders attached to the three faces fronting the channel. Any vessel breasting the dolphin within the allowable approach angle would contact one or two of the fenders. By such an arrangement the corners of the dolphins, which are the likely point of initial contact, are better able to counter the force thereof.

10. Mr. Quinn's conclusions were concurred in by Thomas A. Fridy, Jr., one of the engineering witnesses for the plaintiff. Mr. Fridy is employed by Lockwood Greene Engineers, Inc., which designed the LASH facility.

11. The record of LASH dockings at the GPA facility shows that on twenty-five occasions they were successfully completed with the assistance of two tugs. In four instances three tugs were necessary because of unfavorable weather conditions. On thirteen occasions, the "Calhoun" and "Savannah" assisted in docking the "Bilderdyk" or her sister ship, the "Munchen".

**714**

After all, an 857-foot, 58,000 ton vessel cannot be handled like a rapier. In my opinion, the primary cause of the heavy damage that resulted from the contact with the dolphin was the condition of the fendering system.

Judgment will be entered in favor of the defendants.